IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 11, 2005 Session

## JAMES ROSS KEITH v. JORDAN ASHLEY SURRATT

**Appeal from the Circuit Court for Wilson County**
**No. 12746     C.L. Rogers, Judge**

---

**No. M2004-01835-COA-R3-CV - Filed January 31, 2006**

---

In this child custody case, Father appeals and argues that the trial court erred in awarding Mother primary residential custody of the parties' twin minor children. Mother also appeals and argues that the trial court erred in setting Father's child support, in failing to assess her attorney's fees against Father, and in changing the children's surname to that of Father. After careful review of the evidence and applicable authorities, we find no error and affirm the judgment of the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Cause Remanded**

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Frank Lannom, Lebanon, Tennessee, for the appellant, James Ross Keith.

Stephen W. Pate, Murfreesboro, Tennessee, for the appellee, Jordan Ashley Surratt.

### OPINION

### I.

James Ross Keith, ("Father") and Jordan Ashley Surratt, ("Mother"), were married on February 14, 2002. The parties' marriage was short-lived and was annulled by order entered June 19, 2002. After the marriage was annulled, Mother briefly resided with another couple. However, within a short time, Mother and Father reunited, and, although they did not remarry they resumed living together from August 2, 2002, until November 6, 2002. During this latter period of time, Mother became pregnant with the parties' children.

After the parties separated on November 6, 2002, Mother moved to Savannah, Georgia, where she resided with her father and stepmother. On April 15, 2003, Mother gave birth to twins,

Tucker Chatham Surratt and Savannah Ashton Surratt[1]. On April 18, 2003, Father was informed of the birth, and he traveled to Savannah and submitted to a DNA test on April 30, 2003. On May 12, 2003, Father received the results of the test which confirmed that he was the twins' biological father.

On May 14, 2003, Father petitioned the Circuit Court of Wilson County, Tennessee for legitimation and custody of the twins upon allegations that, *inter alia,* Mother had taken illegal drugs during her pregnancy and that she was not capable of providing the twins with necessary care. On that same date, a restraining order was entered by presiding judge, Honorable Clara Byrd, decreeing that Mother give Father immediate custody of the twins and restraining Mother from coming around Father's residence pending further order of the court. The court also ordered that Mother appear before it on May 23, 2003, and show cause why Father's petition should not be granted.

On May 22, 2003, Mother filed a motion disputing the trial court's venue and requesting that the restraining order be set aside pending a hearing upon that issue and that the show cause hearing be continued. The motion also noted the employment of Father's father, Gary Keith, as head of courtroom security in Wilson County and requested that the court make a determination as to any potential conflict of interest or appearance of impropriety with respect to Father's case being heard by that court.

On August 15, 2003, Judge Byrd recused herself from the case. However, the restraining order of May 14, 2003, was not stayed, and custody of the twins was transferred to Father on August 15, 2003.

In consequence of Judge Byrd's recusal, an order was entered by the Tennessee Supreme Court on August 29, 2003, pursuant to which the case was assigned to the Honorable C.L. Rogers as special judge from another district. Thereafter, Mother filed notice striking her motion to dismiss and submitting to the jurisdiction of the Wilson County Circuit Court based upon her stated intent to reside in Wilson County permanently.

On September 8, 2003, Mother filed a motion requesting that the restraining order of May 14, 2003, be set aside; that she be vested with primary residential care of the parties' twin minor children subject to Father's reasonable visitation; and that Father pay child support consistent with the Tennessee Child Support Guidelines.

By order entered September 30, 2003, after a hearing on September 17, 2003, *inter alia* the trial court decreed that the order of May 14, 2003 be set aside in its entirety, that Mother receive primary custody of the parties' minor twin children *pendente lite* subject to specified visitation by Father, and that Father pay child support in the amount of $608.00 per month.

---

[1]At the time of birth the twins were given the last name "Surratt"; however, this was subsequently changed to "Keith" as noted below.

On October 14, 2003, Mother responded to Father's original petition of May 14, 2003, by answer and counter-petition wherein she requested, among other things, that she be vested with primary custody of the twins and that Father be required to pay child support and be jointly responsible for the children's healthcare expenses.

The case came on for trial on June 24 and 25, 2004, after which, on July 13, 2004, the trial court entered its final order. The order recited the parties' agreement that Father is the natural father of the twin minor children. Based upon various stated findings of fact, the trial court granted the parties joint custody of the twins and vested primary residential responsibility of the twins with Mother. The order further required that Father pay child support in the amount of $476 per month effective July 15, 2004, based upon a gross annual salary of $26,000. The order also decreed that the twins' surname be changed to "Keith" and that each party be responsible for his or her own attorney's fees with court costs being assessed to Father. Father appeals.

## II.

The issues addressed in this appeal are restated as follows:

1. Whether the evidence preponderates against the trial court's ruling vesting Mother, rather than Father, with primary residential responsibility of the parties' minor twin children.

2. Whether the trial court erred in setting the amount of child support to be paid by Father.

3. Whether the trial court erred in changing the children's surname to "Keith."

4. Whether the trial court abused its discretion in failing to require Father to pay Mother's attorney's fees.

## III.

Our review of the trial court's conclusions of law is *de novo* upon the record with no presumption of correctness. *Kendrick v. Shoemake*, 90 S.W.3d 566, 569-570 (Tenn. 2002). Our review of the trial court's findings of fact is *de novo* upon the record accompanied by a presumption of correctness unless the evidence preponderates to the contrary. Tenn. R. App. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001).

## IV.

## A.

The first issue we address is whether the trial court erred in placing primary residential responsibility of the parties' minor twin children with Mother rather than Father. Applying the above standard of review in addressing this issue, we bear in mind that "[t]rial courts are vested with

-3-

wide discretion in matters of child custody and the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993). We further note that because "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during [trial]," appellate courts "are reluctant to second-guess a trial court's decisions." *Gaskill v. Gaskill*, 936 S.W.2d 626,631 (Tenn. Ct. App. 1996).

The paramount consideration in a child custody case such as this one is the best interest of the child in light of the comparative fitness of the parents. *In re C.K.G.*, 173 S.W.3d 714, 732 (Tenn. 2005). As provided by Tenn. Code Ann. § 36-6-106, a court is required to consider "all relevant factors" in making a custody determination, including the following which we find to be pertinent in this case:

> (1) The love, affection and emotional ties existing between the parents and child;
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment ...;
> (4) The stability of the family unit of the parents;
> (5) The mental and physical health of the parents;
> (6) The home, school and community record of the child;
>
> ...
>
> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; ... .
> (9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and
> (10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

In its final order of July 13, 2004, the trial court indicated that it considered the above statutory factors in conducting a comparative fitness analysis in this case and relative to that analysis set forth the following findings of fact:

-4-

The twins, now 15 months old are in the Mother['] s care. The Mother, age 22, lives with her mother and stepfather. The Father, 34, lives with his mother and father. The Mother has a daughter, age 4, by a previous marriage, said child being in the Maternal Grandmother's legal custody. The Father has legal custody of a daughter, age 4, from a previous relationship. Both parents rely on the grandparents for housing and childcare. Both parents have a history of illegal drug use. The Father, in June 2003, resigned as a Deputy Sheriff after accusations of involvement in drug dealing. The Father has problems controlling his temper and conduct. The Father has physically abused the Mother. The Father demanded that the Mother abort the twins. The Father lied about this to the Court. The Father gave no support, financial or in kind for the twins until Court ordered in September 2003. The Maternal Grandparents have assisted their daughter and the twins from birth. The Paternal Grandfather did not know the names of the twins. The Paternal Grandmother did not appear in Court. There was testimony that her physical health problems limited her child care ability. The Mother now lives at home with her mother and stepfather, the twins and her previous daughter. The Father lives at home with his mother and father and his previous daughter. Only on one short occasion has the Father lived away from his parents with his daughter. The parties lived together, were briefly married for several months, during which time the Mother was the care giver for Father's first daughter. The Father now works for his father earning $26,000.00 annual gross as a Security Guard. The Mother has had numerous jobs, she now works in a bar and grill and attends cosmetology school. The Mother earns $8,400 annual gross. The Father made visitation difficult for Mother during Father['] s brief period of a Tennessee ex-parte, Court ordered custody of the one month old twins who were born and resided in Georgia with Mother and her father and stepmother. The Mother has had the twins since birth other than the interruption caused by the ex-parte order and the later recusal of the issuing Judge. The Mother has given proper care and demonstrated proper parental conduct with the twins. The parties appear to have calmed down since the Court order of September 2003 giving Mother primary residential placement and Father specific residential time. Both now reside in the same town. The Father exercises residential time and pays child support. The

Father admits the Mother[']s child care has been proper. The Father fears Mother may leave with the children. The Custody arrangement and relocation conditions will address this fear. The remaining conflict is the paternal grandparents who dislike the Mother and the maternal grandparents who dislike the Father all with reason. Normally this is not a factor, but in this case, both Father and Mother still reside with their respective parents. This factor is considered in the Court's final decision and could, in the future, cause this Court to review its decision if such affects the children's best interests.

In support of his argument that the trial court erred in vesting Mother with primary residential responsibility of the twins, Father asserts that Mother has shown a lack of initiative in providing basic necessities for herself and her first daughter by relinquishing custody of that child to its maternal grandparents and by failing to provide her support. Father also notes in this regard that Mother has in the past failed to maintain "consistent substantial employment" and also has a history of failing to maintain a stable and consistent residence, holding eleven different residences between August 2001 and August 2003. The implication of these assertions is that Mother will not properly care for the twins in a manner consistent with their best interests. We do not find that the evidence supports this conclusion.

As noted, the twins were born on April 15, 2003, and were in Mother's care from that time until they were transferred to the temporary custody of Father on August 15, 2003. Mother was residing in Savannah, Georgia, with her father and stepmother, Stacey Clay, for the first three and a half months after the twins were born, and Ms. Clay testified that Mother "did everything a good mother does" during that period of time. Father's father, Gary Keith, testified that on the day the twins were transferred to the custody of Father, the children were in good physical condition, well fed, and appeared to be properly cared for. The twins were returned to the custody of Mother in September of 2003 and remained in Mother's custody at the time of trial on June 24, 2004. During this period of time the twins and Mother resided exclusively in the home of Mother's biological mother, Gail Allen, who testified as follows:

> Q. Tell the Court what has - - what have you personally observed [Mother] do regarding the care for these twins [sic] children, the children really at issue today, obviously, from September until today?
>
> A. She does everything.
>
> Q. Which is?

A. Feed, change diapers, buy groceries, bathe, play. I mean, we all kind of play with them, but I do not assist in the necessary care of the twins; I do not assist in that. [Mother] does all of it.

Q. Does she ask you to do that?

A. No, she does not.

Q. Based on your observation, does she need your care, assistance, or guidance?

A. No. She's got her hands full, no doubt about it. Of course, a mother would always like to think a child needs their guidance, but you know, she does a good job. The children are cared for, you know; and they're happy, healthy, laughing little babies.

Joyce Tizdale has owned and operated Tizdale Preschool, a licensed and accredited daycare facility, for twenty seven years. She has known Mother for 15 years and kept the twins on Mother's behalf between July of 2003 and May of 2004. Ms. Tizdale testified as follows:

Q. All right. And I believe you've already said [Mother] is responsible for delivering and picking up [the twins]. Her mother is not doing that?

A. No.

Q. And [Father] is not doing that?

A. No.

Q. All right. The appearance of the children every morning when they're brought to your facility, how are they dressed and groomed?

A. They were very well dressed, and she always had - - because I don't furnish their food or their bottles, or their formula or anything - - she always had all that. The children were always dressed very well, were clean, and well groomed.

Q. No problem with personal hygiene?

A. No.

Q. No problems with grooming?

A. No.

Q. No problem with inappropriate clothing?

A. No, none.

Q. And her choice of food and beverage for the children - - was that appropriate?

A It was very well done, very well thought up, and very nutritious.

Q. All right. And did that continue consistently with that pattern from July of '03 until May of '04?

A. Yes.

Q. Was there ever a single incident, a single day that you can tell the Court that you were concerned about either appearance, hygiene, clothing, their diet, their food or anything like that?

A. No. She always had it together.

Q. And based upon your observation of [Mother] during the past year when she would deliver the children in the morning or pick up children in the afternoon, how was her demeanor in her relationship to her children?

A. Very loving. She'd kiss them a lot.

Q. Every morning?

A. Every morning, and sometimes they would cry after because they would want their mommy. That was typical.

Q. In afternoons when she would come pick her up, how would the children react to her?

-8-

A. Very happy.

Q. And how would she react to them?

A. She was happy. She would put her arms out and give them hugs, and they would crawl to her.

Q. All right. Ms. Tizdale, can you tell this Court this evening of a single factor that you personally - - of which you are personally aware that reflects negatively upon [Mother's] parental fitness, anything negative or bad about her ability to care for these children.

A. I don't know anything negative as far as taking care of the children.

Finally, Father himself testified as follows regarding Mother's care of the twins:

Q. From the date that these children obviously have been initially under [Mother's] care and control from the date of birth until August 15 of '03, and then from September 15, on or about - - I'm sorry - - whatever the date was, from September '03 to today when the children have been again in [Mother's] custody, are you aware of any neglect of these children by [Mother]?

A. They've had some rashes that have been - - you know, everybody is going to have diaper rash.

Q. Right.

A. Outside of that rash being so severe, no, I don't know of any mistreatment. I think everything has went well.
...

Q. To the best of your knowledge, I mean, has [Mother] provided, you know, good - - I mean, not just basic care, but good and loving care for these children regarding feeding, clothing, bathing, dealing with them, curing their illnesses?

A. Like I said, I'm not welcome to their house, but everything appears to be correct.

While the record does confirm a degree of instability in Mother's behavior in the past, there is substantial evidence showing that presently Mother has the ability and determination to properly care for the twins, and she has succeeded in this regard at least from the time of their birth in April of 2003 until trial of the case in June of 2004 - a duration of approximately thirteen months not counting the period of time the children were in the custody of Father.

Father's contention that he is comparatively more fit to have primary residential care of the twins is without merit. In particular, we are compelled to this conclusion by two findings of the trial court.

First, the trial court found that Father failed to provide the twins with financial support or in-kind support until ordered to do so in September of 2003. In his brief, Father notes that he had custody of the twins from August 15, 2003, until September 17, 2003, but otherwise admits that this finding is correct and the evidence does not preponderate to the contrary.

Second, the trial court found that Father physically abused Mother. The incident to which this finding is related occurred when Mother returned to Father's residence on November 21, 2002, after the parties' final separation on November 6, 2002. Mother testified as follows:

> I'd been gone for about two weeks. So I called [Father], and I said I'd like to come and get some my belongings because I hadn't taken anything with me - - a couple changes of clothes. So I show up over there to get my stuff, and then I walked in and sat down in the living room. For the first few minutes, we were just talking, and I told him I was going to get some of my stuff. So I'd gone into the laundry room which was on the side of the house. And when I did, it made him mad for some reason, I guess because I was leaving. I was getting my belongings; and that's something that I'd never done, was packed up all my belongings and left. And he grabbed a hold of me from behind. And the glass door was right in front of me. So to keep him from throwing me out the door and down the steps, I put my feet on either side of the door and pushed off. And when I did, he just threw me on the floor, and he hit me in the eye. And it busted some blood vessels, and my eye swelled up.

Sheriff Chris Shockley of the Trousdale Sheriff's Department was dispatched to Father's residence to investigate and testified that Mother exhibited injury consistent with her complaint that Father had hit her in the eye. Mother, who as we have noted was pregnant at the time of this incident, further testified that the day after she was assaulted by Father she went into pre-term labor. On appeal, Father does not contest the trial court's finding that he abused Mother and the evidence does not preponderate otherwise.

-10-

In sum, after careful review of the record, it is our determination that the evidence does not preponderate against the findings of the trial court in this case. It is our further determination that the trial court properly considered the relevant statutory factors under Tenn. Code Ann. § 36-6-101 relative to these findings and did not abuse its discretion in vesting Mother with primary residential responsibility of the parties' twin children.

B.

The next issue we address is whether the trial court erred in setting the amount of child support to be paid by Father.

The trial court decreed that Father pay child support in the amount of $476 per month based upon his current annual gross salary of $26,000. However, Mother notes that Father's testimony indicated that he earned an average annual gross income in the two years preceding trial of approximately $37,000 during which time he was employed by the Wilson's County Sheriff's Department. Mother asserts that this amounts to a gross monthly income of $3,091 and that under the Tennessee Child Support Guidelines, income at this level warrants child support being set at $790 per month for the parties' two minor children. Mother observes that Father conceded that he voluntarily resigned from his position with the Wilson County Sheriff's Department and that he has not sought equivalent employment to compensate for the resulting loss of income he has experienced. It follows, Mother argues, that Father is intentionally underemployed, and child support should be set at $790 per month based upon his prior income. We disagree.

Father testified that in 1996, prior to his employment with the Wilson County Sheriff's Department, he obtained employment with Keith Professional Security Services, a business owned by his father. When Father began employment with the Wilson County Sheriff's Department in March of 2002, he did not give up his job with Keith Professional Security Services, and he testified that he continued to work for both employers and as a consequence worked a total of seventy-two to eighty hours per week. It appears that the annual gross income of $37,000 realized by Father during each of the two years preceding trial constituted the money he earned from two employers by working extensive hours. Upon resigning from the Sheriff's Department in June of 2003, Father continued to work at Keith Professional Security Services and maintained his employment there at the time of trial at an annual salary of $26,000 per year. Mother's argument that Father is underemployed is not based upon proof that he could obtain a more lucrative job, but rather upon the fact that Father no longer realizes the salary he did when he had *two* jobs. We do not agree that a person is voluntarily underemployed because he chooses to work less than seventy-two to eighty hours per week. Accordingly, we find no merit in Mother's argument the trial court erred in setting the amount of Father's child support obligation.

C.

Next, Mother contends that the trial court erred in changing the twins' surname from "Surratt" to "Keith."

The record shows that Mother's surname of "Surratt" is not her maiden name but rather the name she retained after divorcing her ex-husband, William Andrew Surratt. Gary Keith testified as follows regarding why the parties' twin children should bear Father's surname instead:

> If [Mother] gets remarried, she's going to have a name different from her children; and she's going to be in the same shape as [Father] is right now. Those kids are going to look at themselves and say - - you know, when they go to school, and they go to the different functions around, the sporting things, and say, "Well, how come my name is not the same [as] my mother's, and it's not the same as my father's?" I think it's going to have a very adverse reaction on those children.

In its final order the trial court states that "[t]he children shall carry the surname of the natural Father, Keith." Although in its order the court does not offer grounds for its decision in this regard, the court did state as follows at trial:

> And the name - - we have an agreement that the children are to be legitimated. We don't have agreement on the names. Here's where I am on that to give you some input. The custom as far as I know in the whole United States is the child has the name of its natural father, good or bad. And I have put thought into what Mr. Keith, Sr. was saying as far as the children having the name of somebody that's not their father and mother. I mean, so you all see where I'm coming from.

In *Barabas v. Rogers*, 868 S.W.2d 283, 287 (Tenn. Ct. App. 1993), we restated the law governing the change of a child's surname as follows:

> The courts should not change a child's surname unless the change promotes the child's best interests. Among the criteria for determining whether a child's surname will be in the child's best interests are: (1) the child's preference, (2) the change's potential effect on the child's relationship with each parent, (3) the length of time the child has had its present surname, (4) the degree of community respect associated with the present and proposed surname, and (5) the difficulty,

harassment, or embarrassment that the child may experience from bearing either its present or its proposed surname. The parent seeking to change the child's surname has the burden of proving that the change will further the child's best interests.

(Citations omitted).

Mother asserts that "[n]either father nor his witnesses, including his own biological father, testified as to any fact relevant to the five criteria to be considered, regarding a child's name change." However, the primary question that the court must answer before changing the surname of a child is whether the change is in the child's best interests. While the five criteria we referenced in *Barabas* may offer a court guidance in answering that question, those five criteria are not exclusive and obviously may not be relevant given the facts of a particular case. In this case, we find as did the trial court that the testimony of Gary Keith constitutes sufficient proof that it is in the best interests of the parties' children that their surname be changed to "Keith." The trial court properly relied upon this testimony in reaching its decision in that regard.

D.

The final issue we address is whether the trial court abused its discretion in failing to require that Father pay Mother's attorney's fees in this matter.

A trial court's power to award attorney's fees in a custody proceeding is codified at Tenn. Code Ann. § 36-5-103(c) as follows:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing, and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of the court.

Mother's argument that Father should be required to pay her attorney's fees is based upon her assertion that she was awarded residential custody of the parties' children and that Father's income amounts to an average of the $35,000 to $40,000 he earned in 2002 and the $36,693 he

earned in 2003.  As we have noted above, Father resigned from his job with the Wilson County Sheriff's Department in June of 2003, and his annual income at the time of trial had diminished to $26,000 because he was no longer working for two employers.  Mother's argument that Father should be required to pay her attorney's fees based upon an annual salary which substantially exceeds that which he actually receives is without merit.  Based upon our review of the record, we do not agree that the trial court abused its discretion in failing to award Mother attorney's fees in this case.

V.

For the foregoing reasons, we affirm the judgment of the trial court and remand for further action consistent with this opinion.  Costs on appeal are adjudged against James Ross Keith and Jordan Ashley Surratt equally.

_____
SHARON G. LEE,  JUDGE