**Michael Andrew BARABAS, Plaintiff/Appellee,**

v.

**Michelle Lee ROGERS, Defendant/Appellant.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Oct. 29, 1993.

Royce Taylor, Murfreesboro, for defendant/appellant.

Brad W. Hornsby, Murfreesboro, for plaintiff/appellee.

## OPINION

KOCH, Judge.

This appeal involves a dispute over a non-marital child's surname. Several weeks after the child's birth, the father filed a petition in the Rutherford County Juvenile Court seeking to legitimate his son and to give him his surname. The mother, who had already given the boy her surname, opposed changing her son's surname. Following a bench trial, the juvenile court legitimated the child, ordered the father to pay child support, and directed that the child's surname be changed to his father's. Both parties have raised issues on appeal.[1] While we have determined that the decisions concerning the tax exemption and the mother's medical expenses are correct, we have determined that the father has not made out a case for changing the child's surname. Therefore, we vacate the portion of the judgment changing the child's surname to that of the father.

### I.

Michelle Lee Rogers discovered she was pregnant in 1991. Her boyfriend, Michael Andrew Barabas, initially denied that he was the father but eventually agreed to support the child if it turned out to be his. He also insisted that the child, if it were his, bear his surname if it were male but not if it were female. Mr. Barabas soon lost interest in Ms. Rogers and married someone else before the child's birth.

Ms. Rogers gave birth to a son on January 27, 1992. She named him Nicholas Andrew Rogers and placed this name on the child's birth certificate in accordance with Tenn. Code Ann. § 68-3-305(b)(1) (1992). Mr. Barabas asked for permission to take his son to visit his family within days after the child was born. Ms. Rogers declined because the child was only a week old, because she had just returned home from the hospital, and because she was breast feeding the child. Mr. Barabas never requested to see his son again and, contrary to his earlier promises, provided no financial assistance to Ms. Rogers for her medical expenses or for the child's support.

In February 1992 Mr. Barabas filed a legitimation petition in the Rutherford County Juvenile Court. He offered to support the child and requested liberal visitation rights and that the child's name be changed to Nicholas Andrew Barabas. Ms. Rogers objected to changing her son's name but agreed that Mr. Barabas should have visitation rights consistent with the child's age.

The juvenile court conducted an abbreviated hearing in May 1992 at which Mr. Barabas and Ms. Rogers were the only witnesses. On June 16, 1992, it filed an order declaring that Mr. Barabas was the child's father and directing him to pay $74 per week in child support, $1,258 for back child support, and $2,175.80 for Ms. Rogers' medical expenses relating to the child's birth. It also decided that the parties would alternate claiming the child as an exemption for income tax purposes. Finally, the juvenile court directed that the child's surname be changed to Barabas.

### II.

The most hotly contested issue in this case concerns which of his parents' surnames the child should bear. The juvenile court ordered the child's surname changed from Rogers to Barabas solely because of its "rule" that fathers who agree to support their nonmarital children "deserve" to have their children named after them.[2] The juvenile court's rule has no basis in common law or custom. Parties seeking to change a child's surname bear the burden of showing

1. Since juvenile courts are courts of record, Tenn.Code Ann. § 37-1-159(a) (Supp.1993), appeals in proceedings such as this one proceed directly to this court. Tenn.Code Ann. § 37-1-159(g).

2. In announcing its decision from the bench, the juvenile court stated:

I've got rules, Ms. Rogers, as Mr. Taylor told you. If the father requests his name, I'm going to grant that. That's just one of my rules. Maybe I'm wrong, and maybe I'm not looking at it right. But in my mind, if he's going to pay and help pay, which he should for this child and support this child, he deserves that.

That's just the way I've always looked at it. And unless the two parties agree that they don't want to change the name, I change the name.

good cause for the change. Mr. Barabas has not carried his burden in this case.

## A.

Surnames were not common in England before the Norman Conquest. L.G. Pine, *The Story of Surnames* 10 (1969); Percy H. Reaney & R.M. Wilson, *The Dictionary of British Surnames* xxii (3d ed. 1991) ("Reaney & Wilson"). Their use increased after the Battle of Hastings because of the popularity of the Normans' custom of using Christian names. Percy H. Reaney, *The Origin of English Surnames* 314 (1967) ("Reaney").

The first surnames were given spontaneously according to no fixed rules. Reaney, *supra*, at 19–20. They usually described a person's physical characteristics, occupation, or place of origin. Surnames were not usually passed on to descendants and were often changed throughout a person's life as the person's reputation changed. Richard H. Thornton, Note, *The Controversy Over Children's Surnames: Familial Autonomy, Equal Protection and the Child's Best Interests*, 2 Utah L.Rev. 303, 304–06 (1979) ("Thornton"); 57 Am.Jur.2d *Name* § 2 (1988). Accordingly, the common law recognized the right of every person to use and to be known for all legal and social purposes by any surname they chose as long as they had no fraudulent purpose and no intent to interfere with another's rights. *Dunn v. Palermo*, 522 S.W.2d 679, 683 (Tenn.1975); 65 C.J.S. *Names* § 11(1) (1966).

The use of surnames spread more rapidly in some parts of England than it did in others and grew most rapidly among the educated upper classes. Reaney & Wilson, *supra*, at xxiv. They became fixed and hereditary between the Battle of Hastings and Agincourt. C.M. Matthews, *English Surnames* 17 (1967); Reaney, *supra*, at 315; Thornton, *supra*, 2 Utah L.Rev. at 305. One of the reasons for this evolution was that a child's inheritance was often contingent on the child having a name associated with the ancestral property. However, persons did not always use paternal surnames for inheritance purposes. Entire families occasionally took their mother's surname if the property and estates were held by her family. Reaney, *supra*, at 84–85.

The custom eventually evolved to give children born to married couples their father's surname. This custom did not extend to nonmarital children. The early common law considered these children to be "nullius filius" or "children of nobody." *In re Lund's Estate*, 26 Cal.2d 472, 159 P.2d 643, 647 (1945); 2 James Kent, *Commentaries on American Law* *212 (13th ed. 1884); Wilfred Hooper, *The Law of Illegitimacy* 27 (1911) ("Hooper"); Priscilla R. MacDougal, *The Right of Women to Name Their Children*, 3 Law & Ineq.J. 91, 108 (1985). Nonmarital children did not acquire hereditary surnames from either their father or mother but rather gained their surnames later by virtue of their physical characteristics, reputation, or occupation. *Bobo v. Jewell*, 38 Ohio St.3d 330, 528 N.E.2d 180, 183 (1988); 1 William Blackstone, *Commentaries* *459; Edward Coke, *The First Part of the Institutes of the Laws of England*, bk. 1 § 1, at 3.b (1st ed. 1628) (Johnson, et al. ed 1812).

The common law recognized that unmarried mothers obtained their parental rights by giving birth to the child,[3] while fathers obtained their parental rights through marriage.[4] It followed that unmarried mothers possessed greater parental rights than did putative fathers, *In re Cardinal*, 611 A.2d 515, 517 (Del.Fam.Ct.1991); *Bobo v. Jewell*, 528 N.E.2d at 184, and in fact, some commentators stated that fathers had no rights with regard to their nonmarital children. 1 William Blackstone, *Commentaries* *434; see also Hooper, *supra*, at 2–4. Accordingly, it became customary for nonmarital children to

---

**3.** The applicable common-law maxim is "mater est quam gestatio demonstrat" or "she is the mother whom the bearing [of the child] indicates." Sherrie Lynne Russell–Brown, *Parental Rights and Gestational Surrogacy: An Argument Against the Genetic Standard*, 23 Colum.Hum.Rts.L.Rev. 525, 530 (1992) ("Russell–Brown").

**4.** The applicable common law maxim is "pater est quam nuptiae demonstrat" or "he is the father whom the marriage demonstrates." Russell–Brown, *supra*, 23 Colum.Hum.Rts.L.Rev. at 531.

assume their mother's surname at birth rather than their father's. *In re Marriage of Schiffman,* 28 Cal.3d 640, 169 Cal.Rptr. 918, 921, 620 P.2d 579, 582 (1980); *Secretary of Commonwealth v. City Clerk,* 373 Mass. 178, 366 N.E.2d 717, 725 (1977); Thornton, *supra,* 2 Utah L.Rev. at 312 n. 41.

A Norman father desiring to recognize a nonmarital child would often confer on the child his surname with the prefix "Fitz." Harry D. Krause, *Illegitimacy: Law and Social Policy* 32 (1971). Short of an act of Parliament, however, English common-law made no provision for legitimizing a nonmarital child. Jenny Teichman, *Illegitimacy: An Examination of Bastardy* 33–36 (1982). Thus, these children rarely took their father's surname, and neither custom nor the common law recognized a father's right to have his nonmarital children bear his surname.

## B.

The portions of Tennessee's vital records statutes dealing with birth certificates reflect many of these customs and common law principles. The birth certificate of a child born to married parents must show that the child's surname is that of its biological father unless both parents request another name. Tenn. Code Ann. § 68–3–305(a). On the other hand, the birth certificate of a child born to an unmarried mother must reflect that the child's surname is that of the mother unless both parents have requested otherwise. Tenn.Code Ann. § 68–3–305(b)(1).

Later legitimation or paternity proceedings do not necessary result in changing the nonmarital child's surname appearing on its birth certificate. The child's name is not automatically changed if its parents marry later. Tenn.Code Ann. § 36–2–207 (1991). Likewise, a nonmarital child's surname is not changed following a paternity or legitimation proceeding unless the court orders that the name be changed. Tenn.Code Ann. §§ 36–2–208, 36–2–206(b), 68–3–305(c); *see also* Tenn. Comp.R. & Regs. r. 1200–7–1–.04(3)–(5) (1989).

The courts should not change a child's surname unless the change promotes the child's best interests. *Halloran v. Kostka,* 778 S.W.2d 454, 456 (Tenn.Ct.App.1988); *see also In re Marriage of Schiffman,* 169 Cal.Rptr. 918, 921, 620 P.2d 579, 582 (1980); *In re Cardinal,* 611 A.2d at 517; Kristine C. Karnezis, Annotation, *Rights and Remedies of Parents Inter Se With Respect to the Name of Their Children,* 92 A.L.R.3d 66 § 8.5 (Supp.1992). Among the criteria for determining whether changing a child's surname will be in the child's best interests are: (1) the child's preference, (2) the change's potential effect on the child's relationship with each parent (3) the length of time the child has had its present surname, (4) the degree of community respect associated with the present and proposed surname, and (5) the difficulty, harassment, or embarrassment that the child may experience from bearing either its present or its proposed surname. *In re Saxton,* 308 N.W.2d 298, 301 (Minn. 1981); *Bobo v. Jewell,* 528 N.E.2d at 185; *Daves v. Nastros,* 105 Wash.2d 24, 711 P.2d 314, 318 (1985). The parent seeking to change the child's surname has the burden of proving that the change will further the child's best interests. *In re Petition of Schidlmeier,* 344 Pa.Super. 562, 496 A.2d 1249, 1253 (1985); *In re M.L.P.,* 621 S.W.2d 430, 431 (Tex.Ct.App.1981).

## C.

Since Mr. Barabas was the party seeking to change his son's surname, he had the burden of proving that the change would be in the child's best interest. He has failed to carry his burden. He has not demonstrated how, or even if, changing his son's surname would affect the boy's relationship with his parents or with the other family members. He has not demonstrated that using the name Barabas will be any more beneficial than the name Rogers. And finally, he has not demonstrated that his son will encounter difficulties or be subject to harassment or embarrassment if his surname is Rogers instead of Barabas.

Mr. Barabas mistakenly cites *Halloran v. Kostka,* 778 S.W.2d 454 (Tenn.Ct.App.1988) for the proposition that Tennessee recognizes a presumption that a child should bear his or her father's surname under all circum-

stances. The child in *Halloran* was born while her parents were married and, therefore, received her father's surname. The Western Section simply denied the wife's post-divorce efforts to change her daughter's surname by following the common law principle that children of married parents should continue to bear their father's surname unless the parties agree otherwise or unless using the father's surname is not in the child's best interests. *Halloran v. Kostka*, 778 S.W.2d at 457.

We find that the juvenile court's preference for the paternal surname has no legal foundation. The child presently bears his mother's surname in accordance with Tenn. Code Ann. § 68–3–305(b)(1), and the record contains no evidence warranting a change in the child's surname at this time. Accordingly, we vacate the portion of the juvenile court's order directing that the child's name be changed from Rogers to Barabas.

### III.

■ Mr. Barabas also takes issue with the portions of the juvenile court's order requiring him to pay the medical expenses associated with the birth of this son and to pay child support from the date of his son's birth rather than prospectively from the date of the legitimation hearing. He argues that the child was "clearly a blessing to both parties" and, therefore, that they should divide the medical expenses equally. He also argues that he should not be required to pay child support from the date of the child's birth because he was denied visitation with the child prior to the lawsuit.

■ Decisions involving child support obligations in legitimation proceedings are governed by the same principles that govern child support issues in divorce cases. Tenn. Code Ann. § 36–2–203(b)(2) (1991).[5] Not only may courts require fathers to provide financial assistance for the child's day-to-day expenses, but they may also require fathers to pay for the expenses the mother incurs in connection with the pregnancy. Tenn.Code Ann. § 36–2–203(b)(3)(A), (B), (D).

Tenn.Code Ann. § 36–2–203(b)(3)(C) clearly permits courts to require fathers to be responsible for child support expenses incurred before the legitimation proceeding. The Tennessee Supreme Court recently endorsed the award of retroactive child support in paternity proceedings. *State ex rel. Coleman v. Clay*, 805 S.W.2d 752, 755 (Tenn. 1991). Since the pertinent language in Tenn. Code Ann. § 36–2–108(b) is identical to Tenn. Code Ann. § 36–2–203(b)(3)(C), we can conceive of no reason why the legitimate statutes should not be construed to place the same support obligation on fathers.

■ While the child support guidelines govern prospective child support awards in legitimation proceedings, *see* Tenn.Code Ann. § 36–2–203(b)(2) and Tenn.Code Ann. § 36–5–101(e)(1) (Supp.1993), awards for medical expenses and for support between the birth and the legitimation proceeding are discretionary decisions based on the facts of the particular case and the standards that normally govern the issuance of child support orders. *See State ex rel. Coleman v. Clay*, 805 S.W.2d at 755.

The record contains no indication that the juvenile court abused its discretion in making the child support awards in this case. The awards for both retroactive support and medical expenses are supported by the law and the evidence, and Mr. Barabas has presented no reason for us to second-guess the juvenile court's decision.

### IV.

■ Ms. Rogers asserts that the juvenile court should not have permitted Mr. Barabas to claim their son as a tax exemption on alternating years because Mr. Barabas did not overcome the presumption that the custodial parent provided over one-half of the child's support. This presumption is not pertinent to a state court's allocation of the tax exemption, and therefore, we find no reason to second-guess the juvenile court's decision on this matter.

5. The same principles also apply in paternity proceedings. Tenn.Code Ann. § 36–2–108(d) (Supp.1993).

The allowance of deductions for personal exemptions for federal income tax purposes is a federal matter. 26 U.S.C. § 152(e) (Supp.1993). Before January 1, 1985, the Internal Revenue Code accorded state courts the discretionary authority to award the exemption to a noncustodial parent if the prescribed statutory criteria were satisfied. *Hooper v. Hooper,* C.A. No. 1130, 1988 WL 10082, slip op. at 1, 13 T.A.M. 11–6 (Tenn.Ct. App. Feb. 9, 1988), *perm. app. denied* (Tenn. May 2, 1988); *Hiland v. Hiland,* 467 N.E.2d 1253, 1254 (Ind.Ct.App.1984).

The Tax Reform Act of 1984 changed the standards for awarding the dependency exemption to a noncustodial parent. The Internal Revenue Code now allocates the exemption to the custodial parent unless one of three exceptions applies. These exceptions involve situations where the custodial parent has released its claim for an exemption 26 U.S.C. § 152(e)(2), multiple-support agreements 26 U.S.C. § 152(e)(3), and certain pre–1985 instruments 26 U.S.C. § 152(e)(4).

The Tax Reform Act's legislative history indicates that the purpose of these changes was to alleviate the fact-finding burden on the Internal Revenue Service. *Hooper v. Hooper, supra,* slip op. at 2. Under prior law, the question of how much support each parent had provided was a fact issue to be resolved by the Internal Revenue Service whenever the parents could not agree and both attempted to claim the exemption. Now the Internal Revenue Service need not concern itself with these questions because the only relevant issues are which parent is the custodial parent and whether the custodial parent has waived his or her right to claim the exemption.

■■■ Nothing in the federal law prohibits state courts from exercising their power to order a party to execute the release that would enable the noncustodial parent to obtain the exemption. *Hooper v. Hooper, supra,* slip op. at 3. State court allocation of the exemption among the parents is not in-

consistent with 26 U.S.C. § 152(e)'s legislative history, and state court involvement has no impact on the Internal Revenue Service since it will not embroil the Internal Revenue Service in another fact-finding proceeding.

■■■ The courts should consider the tax consequences of their child support orders. *Hill v. Perryman,* App. No. 89–80–II, 1989 WL 108591, slip op. at 2–3, 14 T.A.M. 43–19 (Tenn.Ct.App. Sept. 22, 1989).[6] Their decisions with regard to the allocation of exemptions for minor children are discretionary and should rest on facts of the particular case. *Thompson v. Thompson,* App. No. 89–249–II, 1990 WL 16312, slip op. at 6, 15 T.A.M. 14–25 (Tenn.Ct.App. Feb. 23, 1990).[7] Ms. Rogers has presented no evidence to support the conclusion that the juvenile court abused its discretion by dividing the right to claim the exemption between the parties. Our review of the record satisfies us that the decision is supported by the financial and tax equities of the parties, and therefore, we affirm the allocation of the tax exemption.

### V.

We affirm the portions of the judgment concerning Mr. Barabas' child support obligations and the allocation of the dependent child tax exemption and vacate the portion of the judgment directing that the child's surname be changed. We also remand the case to the juvenile court for whatever further proceedings may be required and tax the costs of this appeal to Michael Andrew Barabas for which execution, if necessary, may issue.

TODD, P.J., and CANTRELL, J., concur.

---

**6.** No application for permission to appeal was filed in this case.

**7.** No application for permission to appeal was filed in this case.