IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 8, 2017 Session

IN RE McKENZIE Z.

**Appeal from the Juvenile Court for Davidson County**
**No. 202577    Sheila Calloway, Judge**

———————————————————

**No. M2017-00484-COA-R3-JV**

———————————————————

Unmarried father filed a petition to establish parentage and a residential parenting schedule.  After father's parentage was established, the juvenile court set a residential parenting schedule that awarded equal parenting time and ordered the child's surname changed to a hyphenated version of both parents' surnames.  Mother appealed, arguing that the court erred in fashioning the parenting schedule and in ordering a change of the child's surname.  Upon review, we affirm the residential parenting schedule but vacate that portion of the order directing a change in the child's surname.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part and Vacated in Part**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and THOMAS R. FRIERSON II, J., joined.

C. Diane Crosier and Jill Hudson, Franklin, Tennessee, for the appellant, Laura Z.

Paul W. Moser (on appeal), Nashville, Tennessee, for the appellee, Kason P.

Thomas H. Miller, Nashville, Tennessee, Guardian ad Litem.

**OPINION**

**I.**

**A.**

McKenzie was born to Laura Z. ("Mother"), a single mother, in 2008.  In September 2014, Mother notified Kason P. ("Father") that he might be McKenzie's

father, and paternity was subsequently confirmed.[1]  Mother arranged some joint outings for Father and daughter to get acquainted, and Father began attending McKenzie's extracurricular activities.  A few months later, McKenzie had two overnight visits at Father's home, where she was introduced to his family.  The new relationship progressed smoothly until mid-January 2015, when Mother and Father had a heated dispute over the logistics of an overnight visit.  After that, Mother refused to allow unsupervised visitation.

Father filed a petition to establish parentage and set a residential schedule in the Juvenile Court for Davidson County, Tennessee.[2]  He asked the court to declare him McKenzie's legal father, name him the primary residential parent, and change McKenzie's surname to a hyphenated version of both Father's and Mother's surnames.

After receiving the results of court-ordered paternity testing, the juvenile court magistrate declared Father to be McKenzie's legal father.  The magistrate reserved the issue of child support for a later date and referred the parties to mediation with instructions to "work out visitation."

Mediation proved unsuccessful, and in November 2015, the magistrate awarded Father a limited amount of temporary parenting time.  Over the course of the next few months, despite Mother's continued objections, the magistrate gradually increased the amount of Father's parenting time to every Thursday after school until Sunday at 6 p.m.  On more than one occasion, the magistrate urged the parents to establish their own visitation schedule.  But they were unable to agree.

In January 2016, the magistrate named Mother primary residential parent and set a permanent residential parenting schedule.  Under the magistrate's plan, the temporary parenting schedule remained in place for the first three weeks.  Then, for the next six months, the parents were to exchange custody weekly.  Thereafter, custody would be exchanged on a monthly basis with the non-residential parent having additional parenting time every other weekend during the month.  The magistrate also set a corresponding amount of child support.

## B.

Mother requested a de novo hearing by the judge of the juvenile court.  *See* Tenn. Code Ann. § 37-1-107(d) (Supp. 2017).  The hearing took place over two separate days.

---

[1] Mother believed another man to be McKenzie's father until paternity testing excluded him.

[2] The State of Tennessee, on behalf of Mother, also filed a petition to establish parentage and set child support.

And multiple witnesses testified, including Mother, Father, and Dr. Jay Woodman, a clinical psychologist. At the time of the hearing, McKenzie was seven years old.

Father first met McKenzie when she was five. He claimed he was unaware that McKenzie was his daughter until Mother contacted him in September 2014.[3] Delighted by the news, Father wanted to spend as much time with McKenzie as possible. He also voluntarily began paying child support.

Father lived with his wife, their three-year-old daughter, and his wife's ten-year-old son from a previous relationship. Father maintained that his family loved McKenzie and that McKenzie had developed a good relationship with her new siblings and stepmother. He also introduced McKenzie to his parents and other extended family.

Although Father's wife cared for McKenzie while he worked, Father was an active parent. Father agreed that McKenzie spent a considerable amount of time playing at home with her new siblings. He explained that, as a father of three, he could not afford a large number of outside activities.

Father admitted that he and Mother had different parenting styles. But he claimed he provided needed structure in McKenzie's life. While moving from a home where she was the center of attention to one in which she had to share the spotlight with two siblings required some adjustment, Father maintained that McKenzie had successfully acclimated to the new environment. He acknowledged that initially she had difficulty sleeping and cried at times. But now, "[i]t's getting way better, period, because I think she's understanding the transition."

Father's wife agreed that McKenzie had adapted to living in their home and confirmed that Father was actively involved in parenting all three children. She also expressed a willingness to work with Mother on any parenting issues.

The paternal grandmother told the court about her growing relationship with McKenzie. She explained that McKenzie was initially unwilling to spend the night at her house, but over time had become more comfortable with overnight visits and large family gatherings.

Mother told a different story. She had raised McKenzie as a single mother, and they were very close. At the time of the hearing, they lived with Mother's parents. As Mother described it, McKenzie enjoyed a strong, stable family environment with Mother and the maternal grandparents. Mother maintained that her close relationship with her daughter meant that she alone knew what was best for McKenzie.

_____

[3] Mother maintained that she initially told Father about McKenzie in 2012, but he ignored her.

While Mother wanted McKenzie to have a healthy relationship with Father, she believed that the magistrate's residential schedule was not in McKenzie's best interest. Mother conceded that the initial visits with Father went well. But, as Father's parenting time increased, McKenzie began having "meltdowns" both before and after every visit. She also expressed negative feelings about herself and once kicked a hole in the wall. Mother claimed McKenzie had become depressed and clingy. She also attributed McKenzie's recent academic and social setbacks to increased time with Father.

The maternal grandmother confirmed Mother's testimony that, since the parenting plan was implemented, McKenzie had become more withdrawn and upset. She agreed that McKenzie was an emotional child and expressed disapproval of Father's parenting style.

In response to McKenzie's perceived unhappiness, Mother scheduled more activities for her and time with friends. McKenzie participated regularly in ice skating, acting, and Girl Scouts. Mother complained that Father was not supportive of McKenzie's activities and failed to consistently take her to scheduled activities on time. For his part, Father objected to Mother repeatedly scheduling activities during his parenting time without consulting him. While he was willing to help, he needed more flexibility because of his other family commitments.

Both parents insisted that the other parent contact McKenzie during their parenting times by calling the residential parent's cell phone. Although Mother claimed that Father blocked her access to McKenzie, she later conceded that she talked to McKenzie at least twice per week during Father's parenting time. Mother insisted that McKenzie never asked to call Father and that Father made no attempt to contact McKenzie during her parenting time. Father claimed he did call in the beginning, but stopped after Mother refused to answer.

Mother also had a litany of complaints about Father's parenting. Although she never made reports to the police or DCS, Mother claimed that Father touched McKenzie inappropriately at bath time. And she maintained that Father berated McKenzie when she cried and warned her never to talk about Mother. Additionally, she complained that Father's three-year-old daughter bit McKenzie; McKenzie developed a rash after Father used the wrong soap; and McKenzie was tardy once during Father's parenting time. For his part, Father denied any abuse.

In early 2016, Mother took McKenzie to see Dr. Woodman to determine whether she needed therapy and to recommend a course of action.[4] Dr. Woodman explained that

---

[4] Although the temporary parenting plan required joint decision making for non-emergency medical care, Mother acknowledged that she never consulted Father about McKenzie's need for therapy and never told him about the visits with Dr. Woodman until her deposition in April 2016.

he met with McKenzie approximately ten times. He also met with Mother but not with Father.

Dr. Woodman agreed that McKenzie needed to spend time with Father to develop a good relationship. But while equal parenting time was possible with these parents, in his opinion, it was too soon. McKenzie had spent the first five years of her life with one parent and was struggling to adjust to a second parent. Based on his interactions with McKenzie, he recommended a residential schedule that emphasized consistency and predictability. He opined that McKenzie's reactions should guide the rate at which her time with Father increased. At the time of the hearing, the residential schedule had recently changed to week-to-week. According to Dr. Woodman, the magistrate had increased McKenzie's time with Father too quickly and thus harmed the father-daughter relationship. And the upcoming change to month-to-month had a significant chance of causing even more harm.

Dr. Woodman acknowledged that both parents loved McKenzie. In his opinion, a good transition from a single parent relationship to co-parenting required open communication between the parents. And he recommended that both parents make an effort to be cordial in front of McKenzie, even if the interaction had to be scripted in advance.

Father and Mother agreed that McKenzie would benefit from seeing her parents get along. Father pointed out that, at times, he and Mother had been able to work together. They had jointly attended McKenzie's first day of school without an argument and had agreed on a workable schedule for McKenzie to participate in Girl Scouts.

But communication between Mother and Father was limited to text messaging. Mother blamed Father for their lack of communication, claiming that he was always combative and argumentative. But Father insisted that the problem was Mother's refusal to listen to his parenting ideas. He claimed that their relationship remained amicable only as long as he followed Mother's lead. Still, Father expressed a desire for a better communication, and Mother indicated that joint decision making was possible.

C.

Following the hearing, the juvenile court issued written findings of fact and conclusions of law. The court named Mother the primary residential parent and awarded both parents equal parenting time. The court also found that Father had met his burden of proving that a change in surname was in McKenzie's best interest and ordered the surname changed to a hyphenated version of both parents' surnames.

5

On appeal, Mother argues that the trial court erred in establishing a residential schedule that provided for equal parenting time and in ordering that McKenzie's surname be changed. She also seeks an award of attorney's fees incurred on appeal.

## II.

### A.

Courts use the same standards applicable to divorce cases when establishing custody and visitation for the child of unmarried parents. *See* Tenn. Code Ann. § 36-2-311(a)(9), (10) (2017). Custody decisions are based on the best interest of the child, which is determined through consideration of a non-exclusive list of statutory factors. *Id.* § 36-6-106(a) (2017). The visitation schedule should be designed to allow the noncustodial parent to maintain a parent-child relationship unless the court finds that visitation would endanger the child. *Id.* § 36-6-301 (2017).

Our courts are directed to fashion a parenting plan "that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the [statutory best interest] factors . . . , the location of the residences of the parents, the child's need for stability and all other relevant factors." *Id.* § 36-6-106(a). The statutory directive stems from a legislative recognition that time spent with both parents is ordinarily in the best interest of the child. *Id.* § 36-6-401 (2017). While "[t]his is not an ironclad rule, . . . barring evidence to the contrary, [a court's] starting point is to proceed with an eye toward maximizing parenting time for each parent." *In re Maddox P.*, No. M2016-00569-COA-R3-JV, 2017 WL 168452, at *6 (Tenn. Ct. App. Jan. 17, 2017). We will affirm an award of equal parenting time when the court's decision is based on a consideration of the relevant facts and the applicable statutory factors.[5] *See, e.g., Woolbright v. Woolbright*, No. M2016-02420-COA-R3-CV, 2018 WL 934815, at *7 (Tenn. Ct. App. Feb. 16, 2018); *Howell v. Smithwick*, No. E2016-00628-COA-R3-CV, 2017 WL 438620, at *8-9 (Tenn. Ct. App. Feb. 1, 2017); *Henegar v. Henegar*, No. M2015-01780-COA-R3-CV, 2016 WL 3675145, at *12 (Tenn. Ct. App. June 29, 2016).

The focus of the court's analysis should always be the best interest of the child. *Shofner v. Shofner*, 181 S.W.3d 703, 715-16 (Tenn. Ct. App. 2004). The determination of a child's best interest presents a question of fact. *Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013); *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Thus, we "presume that a trial court's factual findings on . . . [best interest] are

---

[5] Mother maintains that equal parenting time is appropriate only "when there is *specific, direct proof* that the child's interest will be served best by dividing custody between the parents," relying on *In re Emma E.*, No. M2008-02212-COA-R3-JV, 2010 WL 565630, at *6 (Tenn. Ct. App. Feb. 17, 2010). But *In re Emma E.* predates the General Assembly's directive that we maximize parental participation consistent with the child's best interest. *See* 2011 Tenn. Pub. Acts 1098 (ch. 433). Thus we decline to apply a unique standard of review to an award of equal parenting time.

correct and not overturn them, unless the evidence preponderates against the trial court's findings." *Armbrister*, 414 S.W.3d at 693; Tenn. R. App. P. 13(d). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005). Findings of fact based on a determination of witness credibility are given great weight, and such finding will not be overturned absent clear and convincing evidence to the contrary. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

As we have often noted, "[c]ustody and visitation determinations often hinge on subtle factors." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). Consequently, we "are reluctant to second-guess a trial court's decisions" on such matters. *Id.* We ordinarily leave the details of a parenting plan to the trial court's discretion. *Armbrister*, 414 S.W.3d at 693.

A trial court abuses its discretion only if it applies an incorrect legal standard; reaches an illogical conclusion; bases its decision on a clearly erroneous assessment of the evidence; or employs reasoning that causes an injustice to the complaining party. *Konvalinka v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *see also Kline v. Eyrich*, 69 S.W.3d 197, 203-04 (Tenn. 2002); *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). Review of discretionary decisions requires consideration of three factors: "(1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

B.

Of the relevant best interest factors, the juvenile court determined that one factor favored Father, three favored Mother, and eight factors were equal. Mother contends that the court erred in its analysis of several of the statutory best interest factors and that the evidence preponderates against some of its factual findings. We consider each of Mother's contentions in turn.

The first factor focuses on the "strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child." Tenn. Code Ann. § 36-6-106(a)(1). The court found this factor favored Mother as McKenzie's sole caregiver for the first five years of her life. Although Mother argues that the court should have found this factor favored her more heavily, we discern no error in the court's analysis.

7

Mother challenges the court's determination that the second factor favored Father. This factor concerns each parent's "past and potential for future performance of parenting responsibilities," including each parent's willingness to foster the child's relationship with the other parent. *Id.* § 36-6-106(a)(2).[6] The court found that, although Father had demonstrated the ability to parent and a willingness to co-parent, Mother appeared unwilling to encourage a close relationship between Father and McKenzie.

Mother contends that the court ignored Father's failure to visit McKenzie between January and November 2015 and his refusal to allow McKenzie to communicate with Mother during his parenting time. But Father testified that Mother was the one who stopped cooperating after the January 2015 dispute. Faced with her refusal to allow visitation, he filed this petition for parentage and parenting time. And Mother acknowledged that she was able to talk with McKenzie at least twice a week during Father's parenting time. The juvenile court apparently credited Father's testimony, and we find no basis in this record to overturn the court's credibility finding. *See Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733-34 (Tenn. 2002) ("[F]indings with respect to credibility and the weight of the evidence . . . may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case."). As such, we will not disturb the finding that this factor favored Father.

Under the fourth factor, the court found that both parents had demonstrated an ability to "provide the child with food, clothing, medical care, education and other necessary care." *See* Tenn. Code Ann. § 36-6-106(a)(4). Mother points out that Father stopped paying voluntary child support when she refused to allow visitation. But since filing his petition, Father has resumed paying child support, and we find no indication in this record that he has ever failed to provide McKenzie with food, clothing, and other necessary care during his parenting time. The evidence does not preponderate against the court's finding that this factor was equal.

---

[6] Specifically, under factor (2), the court must consider:

Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order[.]

Tenn. Code Ann. § 36-6-106(a)(2).

Mother also questions the court's finding under the sixth factor that both parents shared a loving relationship with McKenzie. *See id.* § 36-6-106(a)(6). According to Mother, McKenzie's "meltdowns" and other behaviors demonstrated that she did not have an emotional bond with Father. Father and his witnesses, on the other hand, testified to the loving relationship that McKenzie was developing with her new family. Again, the court credited Father's witnesses on this issue, and this record lacks sufficient evidence to overturn the court's finding. *See In re Adoption of A.M.H.*, 215 S.W.3d at 809. We recognize that Dr. Woodman opined that the relationship between Father and McKenzie "isn't as good as what we certainly hoped that it would be." But the court was not bound by Dr. Woodman's opinions. *See Thurman v. Sellers*, 62 S.W.3d 145, 162 (Tenn. Ct. App. 2001) ("Expert testimony is not conclusive, even if uncontradicted, but is rather purely advisory in character, and the trier of fact may place whatever weight it chooses on such testimony."). McKenzie had a strong bond with Mother, and she was developing a relationship with Father.

The court also found that the seventh factor weighed equally. This factor focuses on "[t]he emotional needs and developmental level of the child." Tenn. Code Ann. § 36-6-106(a)(7). Mother argues that Father failed to meet McKenzie's emotional needs. But the court believed that Father could meet her emotional needs "given more time and an opportunity to do so." Based on this record, we cannot say that the evidence preponderates against the court's finding that both parents were able to meet McKenzie's emotional needs.

We also conclude the evidence does not preponderate against the court's finding that factor nine, which concerns the child's interactions with siblings and other relatives, was equal. *See id.* § 36-6-106(a)(9) ("The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities."). McKenzie had a close relationship with her maternal grandparents, and, contrary to Mother's claims, this record also reflects that McKenzie was getting to know her paternal grandmother and other relatives through overnight visits and family gatherings. She also enjoyed a good relationship with her new siblings. One bite mark from a three-year-old does not compel a different conclusion.

Factor twelve concerns the character and behavior of other persons in the parent's home. *Id.* § 36-6-106(a)(12). The evidence does not preponderate against the court's finding that "[t]here was no testimony to question the character of either parent's family." And we discern no error in the court weighing this factor as favoring neither Mother nor Father.

Based on our review, we cannot say that the juvenile court abused its discretion in fashioning this residential schedule. The best interest analysis is a "particularly fact-intensive process." *McEvoy v. Brewer*, No. M2001-02054-COA-R3-CV, 2003 WL

9

22794521, at *5 (Tenn. Ct. App. Nov. 25, 2003). Our role is not to "tweak a visitation order in the hopes of achieving a more reasonable result than the trial court." *Eldridge*, 42 S.W.3d at 88. The court applied the correct law, the evidence does not preponderate against its factual findings, and its decision is within the range of acceptable alternative dispositions. *See Lee Med.*, 312 S.W.3d at 524.

C.

Next, we turn to Father's request to change McKenzie's surname to a hyphenated version of both parents' surnames. By statute, the child of an unmarried mother receives the mother's surname unless both parents have requested otherwise. Tenn. Code Ann. § 68-3-305(b)(1) (2013). Subsequent paternity proceedings do not automatically require a name change. *Barabas v. Rogers*, 868 S.W.2d 283, 287 (Tenn. Ct. App. 1993). Rather, the party seeking a name change must prove by a preponderance of the evidence that the change is in the child's best interest. *Id.*

This court has delineated five factors to aid in determining whether a surname change is in the best interest of the child:

> (1) the child's preference, (2) the change's potential effect on the child's relationship with each parent[,] (3) the length of time the child has had its present surname, (4) the degree of community respect associated with the present and proposed surname, and (5) the difficulty, harassment, or embarrassment that the child may experience from bearing either its present or its proposed surname.

*Id.* These factors are not exhaustive and, given the facts in a particular case, not all the factors may be relevant. *Keith v. Surratt*, No. M2004-01835-COA-R3-CV, 2006 WL 236941, at *8 (Tenn. Ct. App. Jan. 31, 2006).

Although the court found Father had met his burden of proof, we cannot agree. Our review of the record reveals only the following relevant testimony:

Q. And in your petition, did you ask that the child be given your last name?

A. I did.

Q. And are you wanting her to have your last name?

A. Absolutely.

The amount of proof required to obtain a name change is not insubstantial. *In re Joseph H.*, No. M2014-01765-COA-R3-JV, 2015 WL 5032066, at *5 (Tenn. Ct. App.

10

Aug. 25, 2015). A father's mere preference or wish that a child share his surname is not enough. *Howell*, 2017 WL 438620, at *12; *Carroll v. Corcoran*, No. M2012-01101-COA-R3-CV, 2013 WL 2382292, at *6 (Tenn. Ct. App. May 29, 2013); *In re A.C.S.*, No. M2008-898-COA-R3-JV, 2009 WL 348510, at *3 (Tenn. Ct. App. Feb. 12, 2009); *Whited v. Fleenor*, No. E2002-01185-COA-R3-JV, 2003 WL 1092968, at *2 (Tenn. Ct. App. Mar. 13, 2003).

While conceding that there is insufficient evidence in the record to support a name change, Father asserts that the court could take judicial notice of sufficient facts to support a name change. *See* Tenn. R. Evid. 201. "Judicial notice is 'a method of dispensing with the necessity for taking proof.'" *Counts v. Bryan*, 182 S.W.3d 288, 291 (Tenn. Ct. App. 2005) (quoting *State ex rel. Schmittou v. City of Nashville*, 345 S.W.2d 874, 883 (Tenn. 1961)).

But a court may only take judicial notice of adjudicative facts. *Id.* An adjudicative fact "must be one not subject to reasonable dispute, in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Tenn. R. Evid. 201(b). While the court could take judicial notice that McKenzie had her original surname for seven years at the time of the hearing, the facts necessary to establish any of the other factors are not the proper subject of judicial notice. *Cf. Petty v. Petty*, No. E2004-01421-COA-R3-CV, 2005 WL 1183149, at *5 (Tenn. Ct. App. May 19, 2005) (concluding that effect on the children of the father's alleged pornography addiction was not a proper subject of judicial notice); *Berry v. Berry*, No. E2004-01832-COA-R3-CV, 2005 WL 1277847, at *4 (Tenn. Ct. App. May 31, 2005) ("We do not find that homosexuality and its effects on children as they mature is of such a nature that judicial notice is appropriate."); *Highfill v. Baptist Hosp., Inc.*, 819 S.W.2d 436, 439 (Tenn. Ct. App. 1991) ("The effects upon a beholder of an unseemly display of affection are not so well known as to be a subject of judicial notice . . . ."); *Paty v. Paty*, No. C/A 922, 1990 WL 43439, at *2 (Tenn. Ct. App. Apr. 17, 1990) ("That boy children are 'better off with their father' when they 'enter their teens' is not a matter of which the trial court may take judicial notice.").

A child's surname should not be changed in the absence of proof that the change is in the child's best interest. *Barabas*, 868 S.W.2d at 287. Because we conclude Father failed to meet his burden of proof, we vacate that portion of the court's order directing that McKenzie's surname be changed. *See id.* at 288.

D.

Finally, Mother requests an award of her attorney's fees on appeal. Under Tennessee Code Annotated § 36-5-103(c) (2015), we have discretion to award fees incurred on appeal. *See Pippin v. Pippin*, 277 S.W.3d 398, 407 (Tenn. Ct. App. 2008);

11

*Shofner*, 181 S.W.3d at 719. We consider the following factors in our decision to award fees: (1) the requesting party's ability to pay the accrued fees; (2) the requesting party's success in the appeal; (3) whether the requesting party sought the appeal in good faith; and (4) any other relevant equitable factors. *Hill v. Hill*, No. M2006-02753-COA-R3-CV, 2007 WL 4404097, at *6 (Tenn. Ct. App. Dec. 17, 2007). Considering these factors, we decline to award Mother her attorney's fees incurred on appeal.

## III.

For the foregoing reasons, we affirm the juvenile court's residential parenting schedule, but vacate that portion of the court's order directing that McKenzie's surname be changed to a hyphenated version of both parents' surnames.

_____
W. NEAL MCBRAYER, JUDGE