IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 10, 2019 Session

## IN RE KHRYSTCHAN D.[1]

**Appeal from the Juvenile Court for Davidson County
No. 2014-3129, 1873164, PT-192005, PT-193867, PT-200716
Sheila Calloway, Judge**

_____

### No. M2018-01107-COA-R3-JV

_____

In this appeal from Juvenile Court, the Mother of the parties' child appeals the order holding her in criminal contempt for failing to present the child for Father to exercise parenting time and the order changing the child's surname to that of the Father; the Father appeals the designation of Mother as primary residential parent. Upon a thorough review of the record, we affirm the judgment holding Mother in contempt and designating Mother as primary residential parent; we vacate the judgment changing the child's surname and remand the case for the court to make specific findings as to whether the name change is in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in
Part, Vacated in Part and Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Edmund S. Sauer and Kimberly M. Ingram, Nashville, Tennessee, for the appellant, Crystal D-W.

Tiffany D. Hagar, Lebanon Tennessee, for the appellee, Kenneth A.

## OPINION

### I.    FACTUAL AND PROCEDURAL BACKGROUND

Kenneth A. ("Father") and Crystal D.-W. ("Mother") are the parents of Khrystchan ("Child"), who was born in December of 2012. On June 9, 2014, Child

---

[1] This Court has a policy of protecting the identity of children by initializing the last names of the parties.

1

Support Services of Tennessee, on behalf of Mother, filed a petition to establish parentage in the Juvenile Court for Davidson County; by order entered July 24, Father was adjudicated to be Khrystchan's father and his temporary support obligation set. Also on that date Father filed a petition to establish a permanent parenting plan and for custody, which Mother answered on August 22. A hearing was held by the magistrate on September 9, resulting in an order establishing Father's support obligation, and ordering the parties to attend mediation to resolve the other pending issues in the case. Mediation was held on October 28 but did not result in an agreement.

On December 18, 2014, Mother notified Father of her intent to relocate to Cleveland, Ohio, which she did at the end of the month. On December 22, Father moved the court to adopt the parenting plan that he had originally proposed as a temporary plan; in due course, Mother answered. On January 20, 2015, Father filed a petition opposing mother's relocation, which Mother answered on May 26.

The magistrate heard the remainder of the State's original petition, which sought, *inter alia*, to recover an arrearage of support, as well as Father's petitions, on December 7, 2015, March 7 and 14, July 1, and September 19, 2016, and entered an order on September 28, 2016, *inter alia*, allowing Mother to relocate, naming Mother the primary residential parent, adopting a parenting plan, and setting child support (the "September 28 Order."). Pertinent to this appeal, the parenting plan granted Father parenting time every Thanksgiving holiday beginning at 12:00 p.m. on the Wednesday before Thanksgiving and ending at 12:00 p.m. on the Sunday after Thanksgiving; the parties were to exchange the Child at an agreeable location in Cincinnati, Ohio; either parent was allowed to send a designee to transport Khrystchan to the exchange location; and the parent sending the designee was required to communicate that fact to the other by text or email. On October 3, Father filed a request pursuant to Tennessee Code Annotated section 37-1-107 that the Juvenile Court Judge rehear certain of the matters which had been addressed in the September 28 Order; the motion was granted on October 25, and the hearing set for March 27, 2017.

On November 23, 2016, the day before Thanksgiving, Mother gave birth in Cleveland to her second child. That same day, Father appeared in Cincinnati at the agreed exchange location and stayed for several hours; Mother did not appear with Khrystchan nor did Mother send her with a designee. On December 5 Father filed a petition for criminal contempt, contending that Mother should be held in contempt for failing to produce Khrystchan for the Thanksgiving visitation. He filed a second petition for criminal contempt on February 21, 2017, contending that Mother should be held in contempt for failing to "complete any paperwork necessary to add Father to the minor child's birth certificate and submit such paperwork to the proper authority," as required by a previous order entered by the magistrate.

The Juvenile Judge heard Father's appeal of the portions of the September 28

2

Order, as well as Father's original petition to implement his proposed parenting plan and the two contempt petitions, beginning on March 27, and continuing on March 28 and 29, June 23, July 10, and September 21, 2017. The court entered a Final Order on November 7, adopting a parenting plan which designated Mother as primary residential parent and granted her 265 days of residential parenting time and Father 80 days, as well as disposing of all other matters; pursuant to Mother's motion, the court amended the parenting plan in various respects. Mother appeals the holding that she was in contempt of court and the change of Khrystchan's surname; Father appeals the designation of Mother as primary residential parent.[2]

## II.     ANALYSIS

### A.  Criminal Contempt

Tennessee Code Annotated section 16-1-103 provides: "For the effectual exercise of its powers, every court is vested with the power to punish for contempt, as provided for in this code." Courts are specifically empowered to "inflict punishments for contempts of court" for the "willful disobedience or resistance of any . . . party . . . to any lawful writ, process, order, rule, decree, or command of such courts[.]" Tenn. Code Ann. § 29-9-102(3). A court may punish a party for contempt by a fine of $50, imprisonment up to ten days, or both. Tenn. Code Ann. § 29-9-103. The use of a court's contempt power is within the court's sound discretion and will be reviewed by an appellate court under the abuse of discretion standard. *McClain v. McClain*, 539 S.W.3d 170, 187 (Tenn. Ct. App. 2017) (citing M*cLean v. McLean*, No. E2008-02796-COA-R3-CV, 2010 WL 2160752, at *3 (Tenn. Ct. App. May 28, 2010)). Further, on appeal "[i]ndividuals convicted of criminal contempt lose their presumption of innocence and bear the burden of overcoming their presumption of guilt." *Thigpen v. Thigpen*, 874 S.W.2d 51, 53 (Tenn. Ct. App. 1993). Accordingly, "[a]ppellate courts do not review the evidence in a light favorable to the accused and will reverse criminal contempt convictions only when the evidence is insufficient to support the trier-of-fact's finding of contempt beyond a reasonable doubt." *Thigpen,* 874 S.W.2d at 53 (citing Tenn. R. App. P. 13(e)).

In the order holding Mother in contempt, the trial court stated:

…the Court finds beyond a reasonable doubt that Mother had the ability to comply with the Permanent Parenting Plan of September 28, 2016. It is clear that Mother failed to bring child to the exchange. Although the

---

[2] Father articulates his challenge to the designation of Mother thusly: "Whether the Juvenile Court erred in awarding the primary residential status designation to Mother and entering the parties' Permanent Parenting Plan when Mother intentionally relocated to Ohio to defeat Father's claim for equal parenting time?"

Mother had her second baby on the same day, she knew she should have called father to inform him of her inability to travel. Furthermore, Mother could have sent a designee on her behalf.

\*\*\*

…Mother is sentenced to ten (10) days in jail. Said sentence shall be suspended at this time, conditioned upon no future violations for the next six (6) months. If Mother does not provide Father all of his parenting time as afforded according to this order, the suspended sentence shall be revoked, and Mother shall serve ten (10) days in the Davidson County Jail.

There are three essential elements of criminal contempt: (1) a court order, (2) the defendant's violation of that order, and (3) proof that the defendant willfully violated that order. *Pruitt v. Pruitt*, 293 S.W.3d 537, 545 (Tenn. Ct. App. 2008) (citing *Foster v. Foster*, No. M2006-01277-COA-R3-CV, 2007 WL 4530813, at \*5 (Tenn. Ct. App. Dec. 20, 2007)).

Mother does not dispute that she violated the September 2016 order, thereby satisfying the first two elements of *Pruitt*. She argues that her actions were not contemptuous because her failure to appear was not willful. Consequently, as we consider the element of willfulness, we look to the record for evidence of Mother's intent and culpable state of mind. As this court noted in *In re Carolina M.*:

Willfulness, in the context of criminal contempt, requires both (1) intentional conduct, and (2) a culpable state of mind. *Duke v. Duke*, No. M2013–00624–COA–R3–CV, 2014 WL 4966902, at \*31 (Tenn. Ct. App. Oct. 3, 2014). Regarding these requirements, this Court has explained:

The statutory definition of intentional conduct is found in Tennessee Code Annotated section 39–11–302(a) (2010): "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39–11–302(a). To satisfy the culpable state of mind requirement, the act must be "undertaken for a bad purpose." *Konvalinka [v. Chattanooga–Hamilton Cty. Hosp. Auth.]*, 249 S.W.3d [346,] 357 [*(Tenn. 2008)]*. In other words, willful disobedience in the criminal contempt context is conduct "done voluntarily and intentionally and with the specific intent to do something the law forbids." *Id.* (quoting *State v. Braden*, 867 S.W.2d 750, 761 (Tenn. Crim. App. 1993)

(upholding this definition of willful misconduct for criminal contempt)). *Id.*

*In re Carolina M.*, No. M2014-02133-COA-R3-JV, 2016 WL 6427853, at *5–6 (Tenn. Ct. App. Oct. 28, 2016) (quoting *Duke v. Duke*, No. M2013-00624-COA-R3CV, 2014 WL 4966902, at *31 (Tenn. Ct. App. Oct. 3, 2014)).

Evidence pertinent to the question of Mother's intent and state of mind prior to the Thanksgiving 2016 visitation appears in her testimony, the testimony of Father and Grandmother, and in text messages between Mother and Father throughout October and November, wherein Mother and Father texted regarding transporting Khrystchan to Cincinnati for Father to exercise parenting time and travel restrictions caused by Mother's pregnancy.[3]

On October 10 Mother sent Father a message relative to his picking Khrystchan up for parenting time which was set to begin October 27, advising him that she was on travel restrictions until her baby was born and could not drive to Cincinnati, and that there was no one available to make the exchange for her; shew asked of Father could come to Cleveland to pick her up. On October 11, Father responded in two messages, the first stating that the trip to Cleveland would create a "major strain on the time I can spend with Khrystchan as well as my work schedule, and the second advising that "if for any reason I am force[d] to travel to Cleveland to pick up Khrystchan then I need something in writing and notarized that there is an agreement . . . allowing an extended period of visitation. I would like to pick her up and keep her for the six weeks you are unable to travel"; the parties texted back and forth numerous times on the without resolving the matter. On October 12, Father texted Mother stating that he would meet in Cincinnati on the 27[th] for the exchange, as provided in the order; Mother responded that "based on the recommendations of the doctor we won't be in Cincinnati on or before Oct 27th for an exchange". . . and that "[t]he order says that the exchange is to take place at 6p on Oct. 27th. Considering you would have to come all the way here, if you would like you can plan to pick her up early (i.e. 1p) . . . That is the best that I can offer under the circumstances." Father responds promptly, asking "Can you help figure this out" and "[w]hat about your mom. . . uncle. . . Jeremiah or another relative driving you." Although Mother sent a text message to Father on October 26, stating "I will not be in Cincinnati tomorrow and I don't have anyone to force in my place, . . . I want you to also be aware today that she won't make it to Cincinnati as she has no transportation," Father testified that he went to Cincinnati and that "mom showed up in October four hours - - two hours late for the visit in October I got a phone call a couple hours prior said she was

---

[3] The September 28 Order provided that Father would have parenting time for fall vacation in 2016 from 6:00 p.m. on Thursday, October 27, to Sunday, October 30, at 12:00 p.m., and for each Thanksgiving beginning at 12:00 on the Wednesday before Thanksgiving and ending at 12:00 p.m. on the Sunday after Thanksgiving.

just leaving."[4]

With specific reference to the Thanksgiving visitation, on October 31 Father sent Mother a message stating "…until we get all these motions worked out I will follow the court order. I will be in Cincinnati by noon the day before Thanksgivin[g]".  Mother responded on November 10, advising Father that neither she nor her mother would be bringing Khrystchan to Cincinnati, and telling him that "if you want to figure out alternative means then you are welcomed to do so."  Father responds the same day, stating that "[i]f you want to talk about reschedule my visit that is one thing but I am not giving it up entirely."   On November 23, Father sent three different text messages attempting to locate Child between the hours of 11 a.m. to 2 p.m.; the first stating "Or you at McDonalds or Whole foods," the second stating "You never clarified location," and the third stating "Where are you."

At trial, after testifying regarding the aforesaid text messages, Father testified regarding his efforts to pick up Khrystchan in Cincinnati on November 23:

> And then in November, I kept asking when the baby was due, the due date, so I could try to get rescheduled, and no one would tell me the due date of the child, not the paternal grandmother or the mother, and it was like you either come up here or you're not going to get your visit, and then all communication went away. So I was hoping that that was a bluff, so I drove up to Cincinnati. texted, I called, I left voice messages. I waited an extra four hours, and still no show . . . .

Mother likewise testified regarding the text messages, after which she testified as follows relative to the Thanksgiving visitation:

> Q. Okay. And for his visit that was supposed to occur for Thanksgiving, I guess that would have been the Wednesday before Thanksgiving, I don't have that date in front of me –
>
> A. It would have been -- his visit was supposed to happen -- happen on the 23rd.
>
> Q. Okay. And where were you on the 23rd?
>
> A. In the hospital. I gave birth to my child.
>
> Q. When did you give birth to the baby?

---

[4]  Grandmother testified that she and her other daughter drove Khrystchan to Cincinnati and the record contains a text message Father sent Mother on October 28 stating "and tell your mom and sister thanks and I appreciate them stepping up and helping in the exchange where you were unable!"

A.      November 23rd, 2016, 1:17 a.m.

Q.      Okay. And when did you go into labor?

A.      The night before. It was seven o'clock that night.

Q.      Okay. And did you receive any communication from the father -- any specific communication like you testified to from the father prior to the Thanksgiving pickup asking about the visitation at all?

A.      Other than what was going on in that conversation, I would have to go through the texts to be sure. I do know he had – I'm just trying to read through them real fast. I do know that he had mentioned something about he's supposed to get a visit and this, that, or the other. I said, "I understand that. I say, "I'm just trying to tell you I can't travel, there's nobody available to bring her to you." And I reminded him about the order that Judge Ottman put in place that says that we are supposed to be sensitive to life events, and she specifically put the birth of a child in there.

In addition to testifying about the October visitation, with respect to the Thanksgiving visitation, Grandmother testified that she called Father on the evening of November 22 and left him a message that "[Mother] was in the hospital and Khrystchan would not be there," and that Grandmother was present with Mother when the child was born.

The first of series of messages shows that Mother was aware of her pregnancy-related travel restrictions on October 10 and of the challenges in finding someone to drive Khrystchan to Cincinnati for the October exchange; her mother and sister were able to fulfill her obligation. The second series of messages, as well as the testimony, shows that Father advised Mother on October 31 that he intended to follow the order regarding the Thanksgiving visitation and be in Cincinnati on November 23 to pick up Khrystchan; that Mother responded ten days later stating that neither she nor Grandmother would bring Khrystchan to Cincinnati on the 23rd; that the next communication specifically related to the visitation did not occur until Grandmother's call to Father on November 22, when Mother was in the hospital to give birth, leaving him a message; that Father followed the order and went to Cincinnati; and that Mother had not made arrangements to have Khrystchan available in Cincinnati.[5]

Viewed in its entirety and in context, the evidence shows that Mother knew beginning on October 10 that she had restrictions on her ability to travel and would need to find a designee or reach an agreement with Father regarding his ability to exercise

---

[5]  Other messages between the parties after November 10 and predating Thanksgiving related to difficulties Father had with Skype communications with Khrystchan; the messages do not address the exchange in Cincinnati.

parenting time until her restrictions were lifted, and that the parties communicated often through the months of October and November. In the absence of agreement with Father or relief from the order, Mother had the responsibility to make arrangements to get Khrystchan to Cincinnati. Her failure in the time since learning of her travel restrictions to make arrangements to satisfy her obligations under the order relative to the Thanksgiving visitation, the difficulties as to which had been made evident with reference to the October visitation, demonstrates a conscious and deliberate decision to disregard the order.

As noted earlier, because she has been convicted of criminal contempt, Mother loses the presumption of innocence and bears the burden of overcoming the presumption of guilt. *See Thigpen, supra.* In this instance, Mother has the burden of proving that her failure to have Khrystchan in Cincinnati was not willful; on the record presented, she has failed to do so. To the contrary, the evidence fully shows that her failure to act was done "voluntarily and intentionally and with the specific intent to do something the law forbids." *See Konvalinka*, 249 S.W.3d at 357. Accordingly, we affirm the judgment holding Mother in criminal contempt.

**B. Change in the Child's Surname**

Mother contends that the court erred in changing Khrystchan's surname; she argues that the court misapplied the factors to be considered in making a name change and that the change is not in Khrystchan's best interest.

As noted by this court in *Barbaras v. Rogers*:

> The courts should not change a child's surname unless the change promotes the child's best interests. Among the criteria for determining whether changing a child's surname will be in the child's best interest are: (1) the child's preference, (2) the change's potential effect on the child's relationship with each parent, (3) the length of time the child has had its present surname, (4) the degree of community respect associated with the present and proposed surname, and (5) the difficulty, harassment, or embarrassment that the child may experience from bearing either its present or proposed surname. The parent seeking to change the child's surname has the burden of proving that the change will further the child's best interest.

868 S.W.2d 283, 287 (Tenn. Ct. App. 1993) (internal citations omitted). Our review is *de novo* on the record, affording a presumption of correctness to the trial court's factual findings. *Halloran v. Kostka*, 778 S.W.2d 454 (Tenn. Ct. App. 1988); *see also* Tenn. R. App. P. 13(d). *Id*.

We first address Mother's argument that the court "misstated … the factors applicable to a request for a name change." In the Final Order, the court articulated the factors to be applied in its consideration of the name change thusly:

> According to Tennessee law, it is the burden of the petitioner (or the person requesting the change) to establish that a name change of the child would be in the child's best interest. The court has to look at several factors in order to determine if the change would be in the best interest of the child, including but not limited to 1) the child's preference; 2) the name change's potential effect on the child's relationship; 3) the length of time that the child has had the current name; 4) the degree of community respect in regards to the name; and 5) the difficulty, harassment or embarrassment the child may experience with the new name.

Mother argues that the standard as stated by the court "did not accurately reflect governing law," specifically, that the court failed to state that factor two applied to both parent's relationships with Khrystchan, and that the court did not consider the fourth and fifth factors for both the present and proposed surname.

While we agree that the factors articulated in *Barbaras* are to guide the court in its consideration of the proposed name change, we do not agree that any deviation in the articulation of those factors, or for the court to fail to make a finding as to any factor in the absence of proof as to that factor, is error; the factors, however stated, are merely "criteria for determining whether changing a child's surname will be in the child's best interest." *Barbaras*, 868 S.W.2d at 287. Thus, it is not necessary for the court to make a finding as to each factor, and we do not consider the factors to be exclusive of others which may be presented in the record; the ultimate determination is the child's best interest.

In granting the name change, the court held:

> In this case, this Court does find that Father has met the burden of proof that a change in the child's surname would be in her best interest. This Court holds that it is in the best interest of the minor child for her Father's last name of "A[.]" to be her surname, changing the minor child's name to "Khrystchan A. N. A[.]" The Father has shown that a change in the name would not harm the child. The "A[.]" name is a respected name in the community. Furthermore, this is an appropriate age for the name of the child to be changed as she has yet to begin Kindergarten.

The court did not make specific findings of fact, other than as contained in the foregoing quote. The absence of more detailed findings hampers our review, inasmuch as we are reviewing the court's holding that changing her surname is in Khrystchan's best

9

interest, which is an inherently a fact intensive issue. [6] Reluctantly, we must vacate this portion of the order and remand for the court to make appropriate findings as to Khrystchan's best interest.

## C. Designation of Primary Residential Parent

Tennessee Code Annotated section 36-6-402(5) requires a residential parenting schedule to designate a primary residential parent; section 36-6-402(4) defines primary residential parent to be "the parent with whom the child resides more than fifty percent (50%) of the time." In developing the parenting plan, the court is to utilize the factors at section 36-6-106. In our resolution of this issue, we are guided by the following:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge.'" "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. "An abuse of discretion occurs when the trial court ... appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." A trial court

---

[6] As noted in *In re Gunner F.*:

> There are circumstances where, if the trial court fails to make findings of fact, the appellate court may proceed to determine where the preponderance of the evidence lies: "On occasion, when a trial judge fails to make findings of fact and conclusions of law, the appellate court 'may "soldier on" when the case involves only a clear legal issue, or when the court's decision is "readily ascertainable."'" In *Pandey [v. Shrivastava*, No. W2012–00059–COA–R3–CV, 2013 WL 657799, at *5 (Tenn. Ct. App. Feb. 22, 2013)], however, the court concluded that it could not proceed to make its own factual findings because "[d]etermining the best interest of a child is a 'fact-intensive issue,' and the basis of the trial court's decision in this case is not readily ascertainable." Similarly, in *Crafton v. Roberts*, [No. W2015-00048-COA-R3-CV, 2015 WL 9466011, at *8 [(Tenn. Ct. App. Dec. 28, 2015)], the court found "an absence of an appropriate best interest analysis" such that there were "no factual findings that provide insight as to why the trial court reached the decision that it ultimately did." On that basis, the court vacated the trial court's order and remanded the case back to the trial court for further proceedings.

No. M2016-01650-COA-R3-JV, 2017 WL 2438572 (Tenn. Ct. App., May 23, 2017) (internal citations omitted).

10

abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record."

*Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013) (internal citations omitted).

Father does not appeal the residential parenting schedule; he contends that the court abused its discretion in designating Mother as primary residential parent, asserting that Mother relocated to Ohio in order to defeat his claim for equal parenting time. He also contends that the court erred in holding that factors 1, 5 and 10 at section 36-6-106 weighed only in favor of Mother.

We first address Father's argument that Mother moved to Ohio to defeat his parenting time. In his petition opposing Mother's relocation, which was filed pursuant to the relocation statute at Tennessee Code Annotated section 36-6-108 on January 20, 2015,[7] Father specifically alleged that "Mother seeks to move to Cleveland, Ohio due to vindictive motive top keep the minor child away from Father," and requested that Mother "not be allowed to relocate with the minor child to Cleveland, Ohio, or, in the alternative, that the father be granted custody of the minor child and be named the primary residential parent." The issues raised in the petition were fully litigated in the hearing which resulted in this appeal; the court held that "there are legitimate purposes behind her move" and allowed Mother's relocation. Father has not included the court's ruling as an issue in this appeal and has not briefed the issue of whether the trial court erred in the

---

[7] At the time the petition opposing Mother's relocation was filed, Tennessee Code Annotated section 36-6-108(d)(1) provided:

> If the parents are not actually spending substantially equal intervals of time with the child and the parent spending the greater amount of time with the child proposes to relocate with the child, the other parent may, within thirty (30) days of receipt of the notice, file a petition in opposition to removal of the child. The other parent may not attempt to relocate with the child unless expressly authorized to do so by the court pursuant to a change of custody or primary custodial responsibility. The parent spending the greater amount of time with the child shall be permitted to relocate with the child unless the court finds:
> (A) The relocation does not have a reasonable purpose;
> (B) The relocation would pose a threat of specific and serious harm to the child that outweighs the threat of harm to the child of a change of custody; or
> (C) The parent's motive for relocating with the child is vindictive in that it is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child.

11

ruling on Mother's relocation; consequently the issue is waived.

In the Final Order, the court made the following findings as to the factors at section 36-6-106:

> With respect to TCA §36-6-106, the Court hereby conducts a best interest analysis as to which parent should be designated as the Primary Residential Parent and what is the appropriate parenting time for each parent. The court finds the factors weigh as follows:
>
> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child:
>
> Both parents have a strong and stable relationship with the child. However, this factor favors Mother due to Father's lack of knowledge of the minor child for the first two years of her life and her relocation to Ohio. Mother has primarily parented the minor child even after Father learned of the existence of the child. Mother has also performed the majority of parenting responsibilities relating to the daily needs of the child, though this is now due to the geographic distance between the parties.
>
> (2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order:
>
> This factor weighs in favor of the Father. This Court does have a concern regarding both parents' willingness to facilitate a close and continuing relationship between the child and the other parent. Both parents wish to be designated as the primary residential parent with the other parent having limited time. However, Father proposes significant[ly] more time for Mother before the beginning of kindergarten than Mother does for Father. Although there exists a geographical distance between the two, the Court intends to allow both parents to have maximum participation in the

12

child's life.

There is a significant level of distrust between the parties. This is not surprising given the parties did not know one another when the child was conceived. The distrust between the parties began the night of the conception of the child. Both have differing accounts of what took place that evening and disagree regarding most of the specifics circumstances. The relationship between the parties has only deteriorated since the birth of the child. Mother seems to provide Father with only the information she feels he needs to know. Mother is cautious regarding the information she provides to Father as she is concerned it will be used against her in litigation. Father is suspect of the information Mother provides, or fails to provide, and sought to investigate on his own many aspects of Mother and the child's life, which has led to further distrust between the parties. Mother failed to inform Father of the child's medical needs, including an eating issue, until Father obtained the medical records and child's need for glasses for six months after recommendation by the doctor. Mother failed to inform Father of the daycare provider's contact information until required by the Court.

The Court has concerns about the ability of Mother to comply with the Permanent Parenting Plan. There have been several instances in which Mother has not complied with the Court's orders, including bringing the minor child to Nashville to begin Father's supervised visitation, and making arrangements for the child to be brought to the exchange for Thanksgiving 2016. The Court can only go on past behavior of the parties in this respect. It is clear that Mother denied Father several instances of parenting time.

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings:

This factor does not apply in this case.

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care:

This factor is equal. This Court has no concerns about the child's needs being met.

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities:

13

This factor weighs in favor of the Mother. Mother has been the primary caregiver for the child. However, the Court will not diminish Father's involvement in the child's life. Since Father learned of his paternity of the child, he has sought parenting time. Litigation has been extensive due to the allegations made by both parent against each other. Father has shown since his involvement that he has the ability to be the primary caregiver, as he has served as the caregiver for three other children, all of whom are successful and accomplished children.

(6) The love, affection, and emotional ties existing between each parent and the child:

This factor is equal. The parents share a loving and close relationship with the child and are emotionally attached.

(7) The emotional needs and developmental level of the child:

This factor does not apply in this case. Both parties' testimony indicates that the child is a well-adjusted child and is thriving in both homes.

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings:

This factor does not apply in this case. The Court does not have any significant concerns regarding either parent.

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities:

This factor is given equal weight to both parents. Khrystchan has a

14

strong relationship with both sides of her family and seems like a happy child. Khrystchan spends a lot of time with her Step-Mother and seems to have a close relationship with her. The Mother resides with the Maternal Grandmother and Khrystchan has a close relationship with her as well.

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment:

This factor favors Mother. While both home environments are satisfactory and stable, the Mother has had the main responsibility for providing continuity and stability for this child, both while living alone in Nashville, TN and after moving to Cleveland, Ohio.

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings:

This factor does not apply in this case. The allegations initially made against the Father by his wife were never supported by any proof.

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child:

This factor is given equal weight to both parents. Although Father had concerns about Mother's boyfriend and his use of marijuana, there was no information as to the character or behavior of the Mr. Jeremiah D[.] and how it would affect the child.

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children:

This factor does not apply in this case.

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules:

This factor weighs equally between the parents. Both parties are employed full time. Father works for Nelson Mazda and has worked for the company for several years. Mother has had several changes in her employment, but has worked for several years for Cardinal Health. Both

15

parties have made adequate accommodations to be available for their child.

(15) Any other factors deemed relevant by the court.

No additional factors apply in this case.

Father contends that factors 1, 5 and 10 should be weighed equally "based on Mother's unwillingness to have Father involved in the child's life prior to and throughout the litigation." Father's concerns as to the court's weighing of these factors are largely based on the fact that he did not learn of Khrystchan and that he was her father until eighteen months after her birth. He argues that, since that time, he has sought to maintain a relationship with his daughter and, he contends, has been frustrated in that regard by Mother's actions. With respect to each of the factors, the final decree shows that Father's concerns were considered and given substantial weight by the court. Indeed, other than the factors with which Father takes issue, every other factor was found either in his favor (factor (2)), equally in his and Mother's favor (factors (4), (6), (9), (12), and (14)), or not applicable. The record shows that the court fully considered the matters argued by Father. As noted earlier, we give great deference to the trial court in designing parenting plans, including the designation of the primary residential parent. Upon a thorough review of the record, we are not persuaded that the evidence preponderates against the court's designation and do not discern any error of law in the court's application of section 36-6-106 to the facts.

## IV.   CONCLUSION

For the foregoing reasons, we vacate the portion of the order that changes Khrystchan's surname and remand the case for the court to make specific findings as to whether the name change is in her best interest and enter judgment accordingly; in all other respects, the judgment is affirmed.

RICHARD H. DINKINS, JUDGE

16