IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 1, 2024

**IN RE JUSTUS P.**

**Appeal from the Juvenile Court for Benton County**
No. 17-CUST-7      John W. Whitworth, Judge
_____

**No. W2023-00140-COA-R3-JV**
_____

Appellant/Mother appeals the trial court's modification of: (1) the parenting plan for the minor child; and (2) Appellee/Father's child support obligations. Because the trial court erred in setting the parties' respective monthly gross incomes for child support purposes, we vacate its order concerning child support and remand for recalculation. The trial court's order granting Father the federal Child Tax Credit is also vacated. The trial court's order is otherwise affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Vacated in Part; Affirmed in Part; and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ANDY D. BENNETT and KRISTI M. DAVIS, JJ., joined.

Michelle B., Parsons, Tennessee, appellant, pro se.[1]

Terry P., Camden, Tennessee, appellee, pro se.[2]

**OPINION**

**I. Background**

Appellant Michelle B. ("Mother") and Appellee Terry P. ("Father") are the parents of the minor child, Justus P. (the "Child"), who was born in January 2013. The parties were never married, but engaged in an on-again-off-again relationship for approximately ten years.

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

[2] Appellee did not file a brief in this appeal.

Following a break-up, on September 22, 2017, Father filed a petition to establish a permanent parenting plan for the Child. The parties were able to mediate successfully, and, on or about January 3, 2018, the Juvenile Court for Benton County ("trial court") entered an agreed permanent parenting plan (the "2018 Plan"). Under the 2018 Plan, Mother was named the Child's primary residential parent, with 255 days of parenting time. Father was granted 110 days of parenting time. The 2018 Plan split holidays and school breaks, granted joint decision making to the parties, and required Mother to move closer to Benton County to enable the Child to attend school there. At that time, Mother resided in Lobelville, Tennessee, and Father resided in Camden, Tennessee. Following entry of the 2018 Plan, on February 27, 2018, Father filed a motion to correct an alleged typographical error in the 2018 Plan, *i.e.* Father claimed that, at mediation, the parties agreed that his visitation would occur every week, but the "every other week" box was erroneously checked in the 2018 Plan. Father also claimed that, having moved to Lobelville, Mother refused to move back to Benton County to enroll the Child in Benton County schools per the 2018 Plan. Mother opposed the motion concerning the Child's school. She claimed that she agreed to move to Benton County if such move was feasible. She cited the fact that she has four other children (all but one of Mother's other children have reached majority) and could not move to Benton County to facilitate Justus' enrollment in a Benton County school. Following a hearing, the trial court entered an order on June 6, 2018, which required Mother to "have the minor [C]hild available and enrolled in the Benton County School System per the agreement reached and the plan entered," *i.e.*, the 2018 Plan. To that end, the trial court ordered Mother to "move to Benton County to facilitate the [C]hild being enrolled in the Benton County School System if such is required of the primary residential parent by the school system." The trial court cautioned that "failure to do so will be a material change in circumstances and the [2018] Plan maybe set aside or modified by the Court." On August 9, 2018, the trial court entered an order reiterating that the Child was to be enrolled in the Benton County School System by August 13, 2018. According to Father's January 20, 2022 petition, discussed *infra*, Mother failed to comply with the foregoing orders and enrolled Justus in the "Holladay School where he was enrolled until May 2020."

In March 2019, the parties reconciled, and Father moved from Benton County to Decatur County, with Mother, the Child, and Mother's four other children. The parties separated again in April 2020, and Father moved into his father's residence in Camden, Tennessee, where he has lived since that time. Thereafter, the parties continued to disagree concerning Justus' school. During the COVID pandemic, *i.e.*, for the 2020-2021 school year, Mother homeschooled the Child over Father's objection. Then, for the 2021-2022 school year, Mother refused to enroll him in Benton County. This refusal was the basis of Father's January 20, 2022 contempt petition. The trial court declined to find Mother in contempt, and Father does not appeal that decision.

The instant appeal is taken from the trial court's order modifying the 2018 Plan and its recalculation of Father's child support based on that modification. Father, who is

employed as a union pipe fitter, filed his petition to modify the parenting plan because, in February 2021, the location of Father's job changed from Nashville to Clarksville. Based on this change, Father asked Mother to switch parenting days with him, but she allegedly refused. Unable to reach a compromise, on January 20, 2022, Father filed a petition for contempt (based on Mother's refusal to enroll Justus in the Benton County School System) and to modify the 2018 Plan (based on the change in Father's employment and the distance between the parties' residences). Specifically, Father averred that "[M]other has relocated f[a]rther from the [F]ather's residence, and he is currently unable to exercise his Tuesday and Thursday evening time with the [C]hild as ordered. The [M]other works Monday through Friday from 6 p.m. until 10 p.m. and is unable to care for the [C]hild in the evenings after school." Father's proposed parenting plan: (1) named him as the Child's primary residential parent; (2) granted Mother 80 days of parenting time; (3) proposed a parenting schedule of every other weekend for Mother; (4) split holiday and vacation time; and (5) named Father the sole decision maker for major decisions involving the Child. On April 28, 2022, Mother filed an answer in opposition to Father's petition.

The trial court heard Father's petition on May 2, 2022. On May 26, 2022, the trial court entered its findings of fact and conclusions of law, which were incorporated, along with a revised permanent parenting plan and a child support worksheet, into its final order of January 20, 2023 (*nunc pro tunc* to May 26, 2022). The trial court denied Father's petition for contempt, but granted his petition to modify the parenting plan. As discussed below, the trial court found a material change in circumstances because the 2018 Plan was no longer feasible based on Father's work schedule and the distance between the parties' residences, which distance precluded Father's mid-week parenting time. The trial court left Mother's designation as primary residential parent undisturbed but found that it was in the Child's best interest to modify the parenting plan. Under the new parenting plan, Mother received 235 days of parenting time, and Father received 130 days. Father's visitation was set "[f]rom Friday at 6:00 p.m. to Sunday at 6:00 p.m." on "the 1st, 2nd and 4th weekends each month." The trial court granted Father visitation for all of the Child's spring and fall breaks. Concerning the Child's summer breaks, the trial court ordered that

> [t]he [F]ather shall have the [C]hild beginning one week (7 days) following the end of this school year (last day of school) and ending one week (7 days) prior to the beginning of the school year (first day of school). The [M]other shall have the [C]hild every other weekend during the [F]ather's summer months beginning the 2nd full weekend after the [F]ather's summer time begins and one week beginning the last Friday of the [M]other's Fridays in June, from Friday at 6 p.m. until Friday 6 p.m. (For Example: for the 2022-2023 school year, the [C]hild begins school on August 1, 2022. The [F]ather's summer time shall end July 25, 2022 at 6 p.m. School ends on May 26, 2023. The [F]ather's summer time begins June 3, 2023.)

- 3 -

The trial court granted the parties joint decision-making authority over the Child's education, non-emergency healthcare, religious upbringing, and extracurricular activities, with Mother having the tie-breaking vote. The trial court ordered

> [t]he parties . . . to communicate directly with one another concerning the [C]hild's schooling, extra-curricular activities, medical care, and development issues. The [M]other shall provide the [F]ather in advance of any non-emergency medical visits, school or extracurricular activities and other important activities in the [C]hild's life. The parties are ordered to communicate without confrontation or harassment.

Concerning child support, the trial court set Father's gross monthly income at $4,800.00 and set Mother's at $1,952.00. Based on their respective incomes and parenting days, the trial court set Father's monthly child support obligation at $653.00 and ordered that Father could claim the federal income tax exemption for the Child. Mother filed a timely notice of appeal on January 27, 2023.

## II. Issues

As set out in her brief, Mother raises the following issues for review:

I. Whether the Trial Court erred or abused its discretion when it found Father met his burden by a preponderance of the evidence that a material change in circumstances existed to modify the custody determination.
II. Whether the Trial Court erred or abused its discretion when it ordered the modification of the parenting schedule.
III. Whether the Trial Court erred or abused its discretion [by] removing Mother's weekend, holiday and summer visitation, as well as the removal and inclusion of contractual provisions not included in its Findings of Fact and Conclusions of Law.
IV. Whether the Trial Court erred or abused its discretion in requiring Mother to communicate directly with Father and engage in joint decision making.
V. Whether the Trial Court erred or abused its discretion in granting Father the federal tax exemption every year and setting child support with incomes unsupported by the record and its own Findings of Facts and Conclusions of Law.
VI. Whether Mother is entitled to costs and expenses on appeal.

## III. Standard of Review

"A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions." ***Armbrister v. Armbrister***, 414 S.W.3d 685, 692 (Tenn. 2013). We

review a trial court's factual findings *de novo*, "accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); ***Boarman v. Jaynes***, 109 S.W.3d 286, 290 (Tenn. 2003). For the evidence to preponderate against a trial court's findings of fact, it must support another finding of fact with greater convincing effect. ***Realty Shop, Inc. v. RR Westminster Holding, Inc.***, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). We also give great weight to a trial court's factual findings that rest on determinations of credibility. ***Est. of Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997); ***Woodward v. Woodward***, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007); ***B & G Constr., Inc. v. Polk***, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). We review a trial court's conclusions of law "de novo without a presumption of correctness." ***Blair v. Brownson***, 197 S.W.3d 681, 683 (Tenn. 2006).

We review a trial court's decisions related to the details of a parenting plan under an abuse of discretion standard. ***Armbrister***, 414 S.W.3d at 693. This standard does not permit a reviewing court to substitute its discretion for that of the trial court. ***Lee Med., Inc. v. Beecher***, 312 S.W.3d 515, 524 (Tenn. 2010). However, the standard does not immunize a trial court's decision from any meaningful appellate scrutiny:

> [R]eviewing courts should review a [trial] court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions. When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the [trial] court's legal determinations de novo without any presumption of correctness.

*Id.* at 524-25 (citations omitted).

### IV. Analysis

### A. Modification of the Parenting Plan

"Once a permanent parenting plan has been established, 'the parties are required to comply with it unless and until it is modified as permitted by law.'" ***In re Jonathan S.***, No. M2021-00370-COA-R3-JV, 2022 WL 3695066, at *5 (Tenn. Ct. App. Aug. 26, 2022) (quoting ***Armbrister***, 414 S.W.3d at 697). To modify an existing parenting plan, the trial court must first determine whether a material change in circumstances has occurred. ***Armbrister***, 414 S.W.3d at 697-98 (citing Tenn. Code Ann. § 36-6-101(a)(2)(C)). Specifically, "[t]he petitioner . . . must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interests, and the change must have

- 5 -

occurred after entry of the order sought to be modified." ***Gentile v. Gentile***, No. M2014-01356-COA-R3-CV, 2015 WL 8482047, at *5 (Tenn. Ct. App. Dec. 9, 2015) (citing ***Caldwell v. Hill***, 250 S.W.3d 865, 870 (Tenn. Ct. App. 2007)). Where, as in this case, the issue before the court is a modification of the residential parenting schedule, the threshold for determining whether there has been a material change of circumstances is "much lower" as compared to the threshold for modification of the primary residential parent. ***Burnett v. Burnett***, No. M2014-00833-COA-R3-CV, 2015 WL 5157489, at *6 (Tenn. Ct. App. Aug. 31, 2015). Concerning modification of a residential parenting schedule, a material change in circumstances may include, but is not limited to: (1) significant changes in the needs of the child over time, which may include changes related to age; (2) significant changes in the parent's living or working condition that significantly affect parenting; or (3) other circumstances making a change in the residential parenting time in the best interest of the child. Tenn. Code Ann. § 36-6-101(a)(2)(C). If a court finds that there has been a material change in circumstances, it must then consider the factors set out in Tennessee Code Annotated section 36-6-106(a) to determine whether a modification of the parenting plan is in the child's best interest. ***Armbrister***, 414 S.W.3d at 697-98.

Turning to the record, the trial court found a material change in circumstance based on the fact "that the current parenting plan arrangement is not workable due to the father's work schedule and the distance between the residence of the mother and the father. The father is unable to exercise midweek parenting time with the child due to his work hours and lengthy commute." From our review, the evidence satisfies the "very low threshold for establishing a material change of circumstances" under Tennessee Code Annotated section 36-6-101(a)(2)(C). *See **Armbrister***, 414 S.W.3d at 703 (quoting ***Boyer v. Heimermann***, 238 S.W.3d 249, 257 (Tenn. Ct. App. 2007)). In relevant part, Father testified that:

[Q]: And where do you go to work?
[A]: Uh, I go to work in Clarksville.
[Q]: And what's your work schedule?
[A]: Uh, my work schedule is from 7:00 [A.M.] to 3:20 P.M.
[Q]: And Monday through Friday?
[A]: Yes.

***

[Q]: Now, [] when you lived at [Mother's] address in Parsons you were working in Nashville, now you're working in Clarksville. When did that change?
[A]: Uh I started working in Clarksville um, February of 21.
[Q]: February of 21. Were you at any time after this parenting plan from 2018 went into effect able to exercise your Tuesday and Thursday visitation times?
[A]: Uh, not when Justus was living in Parsons.
[Q]: Okay, and why [were] you not able to exercise that?

[A]: Um, because in the parenting plan that we had agreed to uh, in 2018 um, it said that I would agree to do the transportation outside of uh, the weekend so I was obligated to drive to Justus and to return him there and that was uh, a hardship uh, that just wasn't possible to, to perform during the week.
[Q]: And that was from 3:00 P.M. to 7:00 P.M. on Tuesday and Thursdays.
[A]: That's right.
[Q]: So, when you got off work um, if you were off of work and everybody was in Camden would you be able to exercise that Tuesday, Thursday time?
[A]: Yes
[Q]: Now, what time did you get off work when you lived, when you worked in Nashville?
[A]: Uh, 2:30 [P.M.].
[Q]: Okay, and so how would you be able to pick [the Child] up at 3:00 o'clock?
[A]: Uh, well the intention was for the 3:00 o'clock time um, for him to be in the Camden city schools and be able to be picked up by uh, my father uh, or other family members and for Justus to be available when I got home from work.
[Q]: And then you would return him before bed time?
[A]: Yes.
[Q]: All right, now. Now that you are in Clarksville how long would it take you, working in Clarksville, how long would it take you to get to . . . Justus after work?
[A]: Well from Clarksville it would, it takes two hours to drive to Parsons to get him.
[Q]: Okay, and what time do you get off work?
[A]: Uh, I get off work at 3:20 pm.
[Q]: So, you wouldn't even be able to make it to Parsons 'til almost 5:30 and then . . . he has to be back at 7:00.
[A]: That's correct.
[Q]: All right, and then another two-hour round trip home or hour?
[A]: It, it's, it'd be a 50-minute trip home after I left Parsons.

Father's testimony is not disputed, and it is clear that the change in his work schedule "occurred after entry of the order sought to be modified," *i.e.*, the 2018 Plan. ***Gentile***, 2015 WL 8482047, at *5 (citing ***Caldwell***, 250 S.W.3d at 870). As noted above, "[a] material change of circumstance for purposes of modification of a residential parenting schedule may include . . . significant changes in the parent's living or working condition that significantly affect parenting. . ." Tenn. Code Ann. § 36-6-101(a)(2)(C). Here, the testimony establishes that Father's work schedule precludes the mid-week visitation ordered in the 2018 Plan. Missing these mid-week visits has reduced Father's visitation significantly. As such, we affirm the trial court's finding that Father met his burden to show a material change in circumstances sufficient to modify the residential parenting schedule.

- 7 -

We next turn to whether a modification of the residential parenting schedule is in the Child's best interest. In so doing, we review the factors set out at Tennessee Code Annotated section 36-6-106(a). *Armbrister*, 414 S.W.3d at 705. Relevant here, the statutory factors include:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

\*\*\*

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . .

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight

- 8 -

than those of younger children;
(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules . . . .

Tenn. Code Ann. § 36-6-106(a)(1)-(14). The best interest determination "is a fact-sensitive inquiry." ***Steakin v. Steakin***, No. M2017-00115-COA-R3-CV, 2018 WL 334445, at *5 (Tenn. Ct. App. Jan. 9, 2018). The determination "'does not call for a rote examination of each of [the relevant] factors and then a determination of whether the sum of the factors tips in favor of or against the parent.'" ***Id.*** (quoting ***In re Marr***, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005)). Rather, "'[t]he relevancy and weight to be given each factor depends on the unique facts of each case.'" ***Id.*** The goal of section 36-6-106 "is to allow both parents to enjoy the 'maximum participation possible' in the lives of their children." ***Armbrister***, 414 S.W.3d at 707 (citing Tenn. Code Ann. § 36-6-106(a)).

Concerning Justus' best interest, the trial court found:

1. The [M]other in this case has performed the majority of parenting responsibilities for Justus [], during periods of time when the parties were not living together. The [F]ather has been unable to exercise his visits during the week, and has only had parenting responsibilities during his weekend visits. The minor [C]hild does have a good relationship with each parent, but the Court finds that testimony by the [C]hild's counselor, and testimony of the [C]hild in chambers, reflects an especially close relationship with the [M]other.
2. The Court finds that both parents have the potential to parent their [C]hild, but finds that the [M]other's concern with her own emotional ties to the [F]ather have resulted in communication difficulties between the parties, hampering the [F]ather's relationship.

***

5. The Court finds the [M]other has been the primary caregiver for Justus during his lifetime.
6. The Court finds based on the testimony of the [C]hild that he loves both parents, but his emotional ties and affection to the [M]other are significant.
7. The Court finds that the [C]hild's educational needs are met, through his current homeschool program, but that for him to continue to develop socially greater social interaction with children his age will be needed over and above the limited church activities in which he is involved.
8. The Court finds that both parents are fit to parent. . . .
9. The Court finds that the minor [C]hild has strong relationships with his siblings in his [M]other's home, and with his grandfather in his [F]ather's home.

10. As has been mentioned above, the [M]other has established some continuity and stability in the [C]hild's life by her location in Decatur County for more than 4 years and that maintaining that stability is important to the [C]hild's mental health.

11. There has been no evidence to the Court on physical or emotional abuse to the [C]hild, however the [C]hild's counselor and the [C]hild described periods of anxiety during times of separation from the [M]other.

12. The Court finds that the [F]ather has a girlfriend [who] is a positive presence in the [C]hild's life, and that in the [M]other's home the [C]hild has church leaders who are supportive of the family.

13. The Court did hear the testimony of the [C]hild in chambers, but due to the age of the [C]hild, does not consider the [C]hild's preference.

14. The [F]ather's employer requires him to work out of town, however he does return nightly. The paternal grandfather would be required to play a significant role in caring for the [C]hild while in the [F]ather's custody. The Court considers the testimony of Brian White LCSW . . . who has counseled Justus [P.] and the [M]other for several years for separation anxiety disorder, and parent/child relationship issues. The Court finds credible the counselor's opinion that changing the [M]other as primary residential parent would have a negative impact on the minor child.

From our review, it is clear that Justus enjoys a good relationship with both of his parents. As found by the trial court, he also has strong bonds with his half-siblings, who reside with Mother, and with his grandfather, with whom Father resides. The Child's counselor, Brian White, whom the trial court found to be credible, testified that Justus shows some anxiety when separated from Mother. As such, there is evidence to support the trial court's decision to have Mother remain the Child's primary residential parent. As Mr. White explained, "uprooting [the Child] from his [M]other[] would cause [a] severe amount of anxiety and distress for Justus." However, Mr. White also noted that the Child enjoys visits with Father. Clearly, the Child will benefit from a residential schedule that allows significant time with both parents.

As correctly noted by the trial court, when he is with Mother, Justus' social interaction is limited primarily to church activities. In his testimony, Father explained his concern that Justus needs more social interaction with children his own age. Father further explained that his goal is to introduce Justus to as many activities as possible so that Justus may make his own decisions as to what interests him. To this end, Father is very active in introducing the Child to various activities, including sports and music. By all accounts, Father is very hands on and devotes full attention to parenting when Justus is in his care. Father has a good support network, which includes his father and his girlfriend, who are both close with the Child. From our review, the evidence supports the trial court's findings concerning the Child's best interest.

Based on its findings concerning material change in circumstances and best interest, the trial court ordered:

> Having considered all the factors and the entire record in this cause, the Court finds that the [M]other shall continue to be the primary residential parent of Justus [P.]. The [F]ather . . . shall have parenting time the 1st, 2nd, and 4th weekends of each month from Friday until Sunday evening, both spring and fall breaks, ½ Christmas break, alternate holidays, and the summer months beginning one week following the end of the . . . public school year and ending one week prior to the beginning of the . . . school year. The [M]other shall have parenting time every other weekend during the [F]ather's summer months and one week beginning the last of the [M]other's Fridays in June.
>
> ***
>
> Communication
>
> The parties are ordered to communicate directly with one another concerning the [C]hild's schooling, extra-curricular activities, medical care, and development issues. The [M]other shall provide the father in advance of any nonemergency medical visits, school or extracurricular activities and other important activities in the [C]hild's life. The parties are ordered to communicate without, confrontation or harassment.

As an initial matter, in issue 3, Mother broadly asserts that the trial court erred in "remov[ing] and inclu[ding] contractual provisions [assumedly in its parenting plan] not included in its Findings of Fact and Conclusions of Law." However, in the argument section of her brief, she does not specify what those "contractual provisions" are. Accordingly, we will only review the trial court's holdings that Mother specifically raises in her statement of the issues, which include the trial court's decision: (1) to remove Mother's "weekend, holiday and summer visitation"; (2) "requiring Mother to communicate directly with Father and engage in joint decision making"; and (3) allowing Father to claim the Child on his federal income taxes. As noted above, we review a trial court's decisions related to the details of a parenting plan under an abuse of discretion standard. *Armbrister*, 414 S.W.3d at 693. This standard does not permit a reviewing court to substitute its discretion for that of the trial court. *Lee Med., Inc.*, 312 S.W.3d at 524.

Concerning "weekend, holiday, and summer visitation," as set out in context above, the trial court granted Father visitation during the Child's spring and fall breaks and also granted Father the majority of his parenting time during the Child's summer vacation. Father testified that one of the primary issues with the 2018 Plan was that it did not allow him to travel with the Child to visit Father's family, who live out of state. The lack of

sufficient consecutive days of parenting time was cited as the issue, along with Mother's reluctance to allow any deviation from the 2018 Plan. Granting Father fall and spring breaks and significant summer time with the Child will allow Father and Child to visit out-of-state relatives. Furthermore, longer visitation will allow for more bonding between Father and Justus, which bond is becoming more necessary and helpful as the Child ages. The schedule fashioned by the trial court also takes into consideration the fact that Father has limited time with Justus during the weeks he is in school. Hopefully, the longer visits with Father during school breaks will offset the lack of visits during the school term. That being said, the trial court awarded Mother weekend visits during the summer and at least two weeks of uninterrupted parenting time. From the totality of the circumstances, the details of the trial court's parenting plan take into consideration the Child's needs and schedule, as well as the parents' respective desire to spend significant time with Justus within the confines of their work schedules. As such, there is no abuse of discretion.

Mother also asserts that the trial court abused its discretion in requiring "direct" communication between the parties. The issue of communication has been a source of frustration for Father. Concerning communication, Mother candidly testified:

[Q]: When did you block [Father] from your cell phone?
[A]: On several occasions.
[Q]: Is he currently blocked from your cell phone?
[A]: I believe so.
[Q]: Why do you continuously block him from your cell phone?
[A]: To [] eliminate uh, to limit the stress, drama, um interruptions in my life. Um, and also to maintain accountability for the things that are communicated between us so that also there's proof between, you know, [Father] and I, and like I said, accountability.
[Q]: Now you all are supposed to make joint decisions regarding this [C]hild's education, religious upbringing, um medical conditions, and extracurricular activities, is that correct?
[A]: Yes.
[Q]: If you have [Father] blocked from your cell phone how do you do that?
[A]: He has several other avenues to reach me. . . .

***

[Q]: All right, and you have continuously blocked [Father] from your cell phone since 2020, is that correct?
[A]: Yes, off and on. Whenever he, whenever he picks Justus up for visitations I unblock him so that he can contact me directly or Justus can contact me directly, but other than that, yes I block him most all the times on my phone.

- 12 -

[Q]: All right. Now um, when Justus has testing at school, how does [Father] find out about that?

[A]: I gave him the school's, he asked me, he wanted everything regarding, um Justus's school, and so I gave him his teacher's, through the pastor and . . . I text him the um name of the school. I text him uh, his, the screenshot of his classes, the times they start and end. I um, text him his grades, his grade report, his attendance report. I also messaged um the teachers' names and their phone numbers and emails so that he can contact them directly.

[Q]: Now you don't do that. You send that through third parties to do that, correct?

[A]: I did send it through a third party to do that, yes, sent it to him.

Father testified, in relevant part:

[Q]: . . .[Mother's] testimony was that she has you blocked from her cell phone except when Justus is with you, is that true?

[A]: A majority of the time.

[Q]: And when she unblocks you do you know why she unblocks you?

[A]: Um, there's something that she deems necessary to communicate.

[Q]: All right. Now is there any other way that you can communicate about Justus except her cell phone?

[A]: No um, my access is extremely limited. Um, you know basically if there's anything that I need to know um, for instance, I knew Justus hadn't gone to a dentist appointment in a while. I hadn't been notified of one in a while and so I asked through a third party, because that's the only way that I could get information for them to relay it, you know what's going on. And uh, they responded back maybe the day after and [Mother] had, you know, let me know through them that she had a dentist appointment scheduled. So as far as things like that, um, I don't have any ability to have any input. I'm, I'm very restricted in, you know, being able to voice what I think is best.

[Q]: Is that regarding dentist appointments?

[A]: That's regarding everything in general. And, and, and dentist appointments just happened to fall within that.

[Q]: How do you find out when Justus is going to the doctor?

[A]: Uh, typically it would just be by him mentioning it, uh, when I have him. You know, basically if it happened recently, within a day or two of me picking him up, it's still fresh in his mind. And so he would, you know, notify me that he had gone to the doctor for a particular thing.

[Q]: Does his [M]other ever call you, and, or text you, or email you or have third parties email or contact you in advance of any medical appointments?

[A]: No. Like she stated before, she's sent me information and she has

communicated that she expects me to call these offices to determine, uh, if Justus has any future visits.

***

[Q]: Okay. Are you made aware of any of his extracurricular activities with his homeschooling in advance?
[A]: No

The foregoing arrangement is unworkable. Tennessee Code Annotated section 36-6-101 sets out certain rights to which every parent is entitled. These rights were specifically enumerated in the parties' parenting plan and, in relevant part, provide each parent with:

 (1) The right to unimpeded telephone conversation with the child at least twice a week at reasonable times and for reasonable durations. The parent exercising parenting time shall furnish the other parent with a telephone number where the child may be reached at the days and time specified in a parenting plan or other court order or, where days and times are not specified, at reasonable times;

***

 (7) The right to be given at least forty-eight (48) hours' notice, wherever possible, of all extracurricular school, athletic, church activities and other activities as to which parental participation or observation would be appropriate, and the opportunity to participate in or observe them. The parent who has enrolled the child in each such activity shall advise the other parent of the activity and provide contact information for the person responsible for its scheduling so that the other parent may make arrangement to participate or observe whenever possible, unless otherwise provided by law or court order.

Mother's blocking Father from calling her and her insistence that Father get information, if at all, from third parties and through his own cold calling is not in the best interest of the Child and is contrary to the parental rights enumerated above. The trial court order requiring direct communication was made in an effort to curtail the issues outlined in the parties' respective testimony. There is no abuse of discretion in this ruling.

### B. Child Support / Income Tax Credit

Child support decisions are reviewed for an abuse of discretion. ***Bastone v. Bastone***, No. E2020-00711-COA-R3-CV, 2021 WL 1711098, at *5 (Tenn. Ct. App. Apr. 30, 2021)

(citing *Mayfield v. Mayfield*, 395 S.W.3d 108, 114-15 (Tenn. 2012)). As this Court has explained,

> [p]rior to the adoption of the Child Support Guidelines, trial courts had wide discretion in matters relating to child custody and support. *Hopkins v. Hopkins*, 152 S.W.3d 447, 452 (Tenn. 2004) (Barker, J., dissenting). Their discretion was guided only by broad equitable principles and rules which took into consideration the condition and means of each parent. *Brooks v. Brooks*, 166 Tenn. 255, 257, 61 S.W.2d 654, 654 (1933). However, the adoption of the Child Support Guidelines has limited the courts' discretion substantially, and decisions regarding child support must be made within the strictures of the Child Support Guidelines. *Berryhill v. Rhodes*, 21 S.W.3d 188, 193 (Tenn. 2000); *Jones v. Jones*, 930 S.W.2d 541, 545 (Tenn. 1996); *Smith v. Smith*, 165 S.W.3d 279, 282 (Tenn. Ct. App. 2004).
>
> * * *
>
> Because child support decisions retain an element of discretion, we review them using the deferential "abuse of discretion" standard. This standard is a review-constraining standard of review that calls for less intense appellate review and, therefore, less likelihood that the trial court's decision will be reversed. *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999).

*Id.* (quoting *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005)).

The "process and criteria for ascertaining a parent's child support obligation is governed by Child Support Guidelines promulgated by the Tennessee Department of Human Services[.]" *Beyer v. Beyer*, 428 S.W.3d 59, 73 (Tenn. Ct. App. 2013) (quoting *Reeder v. Reeder*, 375 S.W.3d 268, 275 (Tenn. Ct. App. 2012)). The Child Support Guidelines have the force of law. *Wade v. Wade*, 115 S.W.3d 917, 922 (Tenn. Ct. App. 2002) (citing *Jahn v. Jahn*, 932 S.W.2d 939, 943 (Tenn. Ct. App. 1996)). Under the Guidelines, a parent's basic child support obligation is "based on an Income Shares Model, which 'presumes that both parents contribute to the financial support of the child in pro rata proportion to the actual income available to each parent.'" *Johnson v. Johnson*, No. M2008-00236-COA-R3-CV, 2009 WL 890893, at *3 (Tenn. Ct. App. Apr. 2, 2009) (quoting Tenn. Comp. R. & Regs. 1240-2-4-.03(1)(a)). Pursuant to the Income Shares Model,

> "both parents' actual income and actual additional expenses of rearing the child are considered and made part of the support order." Tenn. Comp. R. & Regs. 1240-2-4-.03(1)(b). After each parent's income is calculated, the trial

- 15 -

court must then refer to "a numerical schedule, designated in these Guidelines as the Child Support Schedule (CS Schedule or Schedule) . . ., that establishes the dollar amount of child support obligations corresponding to various levels of parents' combined Adjusted Gross Income and the number of children for whom the child support order is being established or modified." Tenn. Comp. R. & Regs. 1240-2-4-.03(6)(a)(1). The dollar amount derived from the Schedule is a parent's Basic Child Support Obligation ("BCSO"). *Id.*

*Johnson*, 2009 WL 890893, at *3. Once "the amount of support to be paid for the child derived from the parent's proportional share of the [BCSO]" is adjusted "for parenting time, plus the parent's proportional share of any additional expenses[,]" the resulting amount is the presumptive child support required. Tenn. Comp. R. & Regs. 1240-02-04-.02(21); *see also* **Richardson**, 180 S.W.3d at 725 ("[T]he amount of support derived from a proper application of the formula in the Child Support Guidelines becomes the presumptive amount of child support owed.").

Turning to the record, the trial court held that "[c]hild support should be paid according to the child support guidelines with the [M]other having the ability to earn minimum wage on a 40 hour per week job, if her current pay is less than that amount." In the incorporated child support worksheet, the trial court set Mother's gross monthly income at $1,962.00 and set Father's at $4,800.00. On appeal, Mother asserts that these gross monthly income amounts were incorrect and unsupported by the record. As stated in her brief, Mother specifically asserts that:

> The Trial Court erred when it entered the Parenting Plan stating Father's income at $4,800 gross per month and Mother's at $1,962 per month, and the plan is contradictory with the actual findings of fact and conclusions of law. In addition to his testimony, Father provided one piece of evidence in support of his income, which was a paystub for the pay period from 04/05/2022 to 04/12/2022. It is not clear from the record why Father did not produce his most current pay stub.

We note that Mother did not object to the introduction of Father's paystub as Trial Exhibit 18, nor did she raise an issue in the trial court that the proffered paystub was inaccurate. "Tennessee courts have long recognized that, in order to preserve an issue on appeal, an objection must be made in a timely manner before the trial court." *Eldridge v. Eldridge*, No. 01A01-9808-CV-00451, 1999 WL 767792, at *3 (Tenn. Ct. App. Sept. 29, 1999). Regardless, Mother now argues on appeal that Father's "paystub indicates significantly higher monthly gross income than $4,800." Mother contends that Father's "income should be calculated by determining his average monthly gross earnings. Pursuant to the guidelines, this should include regular wages, bonuses, and overtime earnings." At trial, Mother did not question Father concerning any overtime pay that he received. On direct

examination, Father testified only that overtime was "voluntary." Because it is the only evidence of Father's income, we have reviewed Father's paystub. The paystub, which is for the pay period "04/06/22—04/12/22," indicates that Father's "pay frequency" is "weekly." As such, the gross pay $1,986.04 that Father received in his April 15 paycheck was for one week of work. The $1,986.00 includes $480.04 in overtime pay (again, there was no testimony concerning how often or how much Father receives in overtime pay); so, Father's weekly base pay amount is $1,506.00. Assuming that Father makes a minimum of $1,506.00 per week, his gross monthly income would be upwards of $6,000.00. So, in setting Father's gross monthly income at $4,800.00, it appears that the trial court not only assumed that Father's paystub was for two weeks of work (as opposed to one week of work), but it also failed to consider Father's overtime pay.

Mother also asserts that the trial court "imputed" income to her and erred in overcalculating her gross monthly income for child support purposes. We disagree. Concerning her income, Mother testified, in relevant part, as follows:

[A]: I work for the pharmacy in Parsons. I deliver medications for a pharmacy.
[Q]: What's your schedule?
[A]: Um, 6:30 to 10:30 P.M.
[Q]: And is the, what days of the week?
[A]: Monday through Thursday.

***

[Q]: Your only source of income, is the delivery from the pharmacy?
[A]: Yeah, well besides child support, yes

***

[Q]: And what is your hourly rate at work?
[A]: UM, I don't get an hourly rate. I get paid per delivery or per route. It's paid per route.
[Q]: And so, what is that?
[A]: It is uh, at the, it was 122 and because the gas prices, they increased it, my route by eight dollars. . . .
[Q]: So, what is it?
[A]: 130 per night.

From Mother's testimony, she works four nights per week and makes $130 per night, which would result in gross income of $520.00 per week, or $2,253.33 gross income per month (*i.e.*, $520.00 times 52 weeks divided by 12 months). So, the trial court's setting Mother's gross monthly income at $1,986.00, even if this was an imputed income, resulted in the

assignment of a gross monthly income that was approximately $267.33 less than Mother's actual gross monthly income according to her testimony.

Because the trial court erred in calculating the parties' respective gross monthly incomes for child support purposes, we vacate the trial court's calculation of child support, and remand for recalculation of the parties' incomes and resetting of child support under the Child Support Guidelines. To this end, the trial court is not precluded from reopening proof concerning the parties' respective incomes.

As to the trial court's granting Father the federal income tax exemption for the Child, we again note that the trial court named Mother as the Child's primary residential parent. Under the Child Support Guidelines, there is an assumption that the primary residential parent "claims the tax exemptions for the child or tax benefits associated with the child such as the Federal Earned Tax Credit[.]" Tenn. Comp. R. & Regs. 1240-02-04-.03(4)(b)(3)(ii). Such assumption is in line with the federal law on the matter. This Court has explained that

> [t]he allowance of deductions for personal exemptions for federal income tax purposes is a federal matter. 26 U.S.C. § 152(e) (Supp.1993). Before January 1, 1985, the Internal Revenue Code accorded state courts the discretionary authority to award the exemption to a noncustodial parent if the prescribed statutory criteria were satisfied. *Hooper v. Hooper*, [No. C.A. 1130, 1988 WL 10082, at *1 (Tenn. Ct. App. Feb. 9, 1988)], *perm. app. denied* (Tenn. May 2, 1988); *Hiland v. Hiland*, 467 N.E.2d 1253, 1254 (Ind. Ct. App. 1984).

> The Tax Reform Act of 1984 changed the standards for awarding the dependency exemption to a noncustodial parent. The Internal Revenue Code now allocates the exemption to the custodial parent unless one of three exceptions applies. These exceptions involve situations where the custodial parent has released its claim for an exemption 26 U.S.C. § 152(e)(2), multiple-support agreements 26 U.S.C. § 152(e)(3), and certain pre–1985 instruments 26 U.S.C. § 152(e)(4).

> The Tax Reform Act's legislative history indicates that the purpose of these changes was to alleviate the fact-finding burden on the Internal Revenue Service. *Hooper*, [1988 WL 10082, at *3]. Under prior law, the question of how much support each parent had provided was a fact issue to be resolved by the Internal Revenue Service whenever the parents could not agree and both attempted to claim the exemption. Now the Internal Revenue Service need not concern itself with these questions because the only relevant issues are which parent is the custodial parent and whether the custodial parent has waived his or her right to claim the exemption.

- 18 -

Nothing in the federal law prohibits state courts from exercising their power to order a party to execute the release that would enable the noncustodial parent to obtain the exemption. [*Id.*] State court allocation of the exemption among the parents is not inconsistent with 26 U.S.C. § 152(e)'s legislative history, and state court involvement has no impact on the Internal Revenue Service since it will not embroil the Internal Revenue Service in another fact-finding proceeding.

The courts should consider the tax consequences of their child support orders. ***Hill v. Perryman***, [No. 89-80-II, 1989 WL 108591, at *2] (Tenn. Ct. App. Sept. 22, 1989). Their decisions with regard to the allocation of exemptions for minor children are discretionary and should rest on facts of the particular case. ***Thompson v. Thompson***, [No. 89-249-II, 1990 WL 16312, at *6] (Tenn. Ct. App. Feb. 23, 1990).

***Barabas v. Rogers***, 868 S.W.2d 283, 289 (Tenn. Ct. App. 1993) (footnote omitted); *see also* ***Neveau v. Neveau***, No. E2015-02221-COA-R3-CV, 2017 WL 2459731, at *12 (Tenn. Ct. App. June 7, 2017); ***Reeder***, 375 S.W.3d at 280; ***Farmer v. Stark***, No. M2007-01482-COA-R3-CV, 2008 WL 836092, at *9 (Tenn. Ct. App. Mar. 27, 2008); ***Chandler v. Chandler***, No. W2006-00493-COA-R3-CV, 2007 WL 1840818, at *9 (Tenn. Ct. App. June 28, 2007). So, although "the custodial parent is generally entitled to claim the children as dependents under the Internal Revenue Code, a court may, in its discretion, allocate the dependency exemption to the non-custodial parent." ***Travis v. Travis***, No. E2000-01043-COA-R3-CV, 2001 WL 261543, at *5 (Tenn. Ct. App. March 16, 2021) (citing ***Barabas***, 868 S.W.2d 283). Having vacated the trial court's calculation of the parties' respective gross monthly incomes and its calculation of Father's child support obligation, we also vacate the trial court's award of the Child Tax Credit to Father. If, on remand, the trial court should deviate from the Child Support Guidelines to award the tax credit to Father, it should explain the basis of its decision in view of the "financial and tax equities of the parties." ***Id.*** at *4.

### C. Attorney's Fees

Mother asks this Court to award her attorney's fees on appeal. Tennessee Code Annotated § 36-5-103(c) provides:

A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the nonprevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon

the original divorce hearing and at any subsequent hearing.

However, in the instant appeal, Mother is proceeding *pro se*. As such, she has not incurred any attorney's fees, and the foregoing statute is not applicable. Accordingly, Mother's request is denied.

## V. Conclusion

For the foregoing reasons, the trial court's order on child support and its order granting Father the federal income tax exemption for the Child is vacated. The trial court's order is otherwise affirmed, and the case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed one-half to the Appellant, Michelle B., and one-half to Appellee, Terry P., for all of which execution may issue if necessary.

s/ Kenny Armstrong
KENNY ARMSTRONG, JUDGE